## JOHN DOE *v.* YALE UNIVERSITY
### (SC 15955)

Borden, Palmer, Sullivan, Callahan, Hennessy, Vertefeuille and Leuba, Js.

Argued October 28, 1999—officially released April 11, 2000

*Mark R. Kravitz*, with whom were *Wesley W. Horton*, *Susan M. Cormier* and, on the brief, *William J. Doyle*, *Alex V. Chachkes*, and *Jonathan M. Freiman, Allison A. Wood, Bageshree R. Blasius* and *Daniel J. Krisch*, legal interns, for the appellant (defendant).

*Michael P. Koskoff*, with whom was *David N. Rosen*, for the appellee (plaintiff).

*Suzannah K. Nigro*, for the appellee (intervening plaintiff).

*Opinion*

BORDEN, J. The defendant, Yale University, appeals[1] from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, John Doe.[2] The defendant claims that: (1) the plaintiff's claim is not a cognizable cause of action because it is in effect a claim for educational malpractice; (2) the trial court improperly struck the defendant's special defense of exclusivity under the Workers' Compensation Act (act); General Statutes § 31-284 (a);[3] and (3) the trial court improperly

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Although the female plaintiff was granted permission to prosecute the action using the fictitious name John Doe, we will use feminine pronouns when referring to her.

[3] General Statutes § 31-284 provides: "Basic rights and liabilities. Civil action to enjoin noncomplying employer from entering into employment contracts. Notice of availability of compensation. (a) An employer who complies with the requirements of subsection (b) of this section shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, but an employer shall secure compensation for his employees as provided under this chapter, except that compensation shall not be paid when the personal injury has been caused by the wilful and serious misconduct of the injured employee or by his intoxication. All rights and claims between an employer who complies with the requirements of subsection (b) of this section and employ-

instructed the jury that it could find the defendant liable

ees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment are abolished other than rights and claims given by this chapter, provided nothing in this section shall prohibit any employee from securing, by agreement with his employer, additional compensation from his employer for the injury or from enforcing any agreement for additional compensation.

"(b) Each employer who does not furnish to the chairman of the Workers' Compensation Commission satisfactory proof of his solvency and financial . ability to pay directly to injured employees or other beneficiaries compensation provided by this chapter shall insure his full liability under this chapter, other than his liability for assessments pursuant to sections 31-345 and 31-354 in one of the following ways: (1) By filing with the Insurance Commissioner in form acceptable to him security guaranteeing the performance of the obligations of this chapter by the employer; or (2) by insuring his full liability under this part, exclusive of any liability resulting from the terms of section 31-284b, in any stock or mutual companies or associations that are or may be authorized to take such risks in this state; or (3) by any combination of the methods provided in subdivisions (1) and (2) of this subsection as he may choose, subject to the approval of the Insurance Commissioner. If the employer fails to comply with the requirements of this subsection, an employee may bring an action against such employer for damages on account of personal injury sustained by such employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, except that there shall be no liability under this section to an individual on the part of the employer if such individual held himself out to the employer as an independent contractor and the employer, in good faith, relied on that representation as well as other indicia of such status and classified such individual as an independent contractor. In case of an alleged noncompliance with the provisions of this subsection, a certificate of noncompliance under oath, by the chairman of the Workers' Compensation Commission, shall constitute prima facie evidence of noncompliance.

"(c) Each employer who does not furnish to the chairman of the Workers' Compensation Commission satisfactory proof of his solvency and financial ability to pay directly to the State Treasurer the assessments required in sections 31-345 and 31-354 shall insure his full liability for the assessments in one of the following ways: (1) By filing with the Insurance Commissioner in form acceptable to him security guaranteeing the payment of the assessments by the employer; (2) by insuring his full liability for the assessments in any stock or mutual companies or associations that are or may be authorized to take such risks in this state; or (3) by any combination of the methods provided in subdivisions (1) and (2) of this subsection as he may choose, subject to the approval of the Insurance Commissioner. The payment of the assessments required under sections 31-345 and 31-354 is a condition of doing business in this state and failure to pay the assessments, when due, shall result in the denial of the privilege of doing business in this state or

on the basis of its own determinations of reasonableness, rather than on the basis of expert testimony. We agree with the second and third of these claims and, accordingly, we reverse the trial court's judgment.

The plaintiff brought this action against the defendant for alleged negligence in causing her to contract the human immunodeficiency virus (HIV). The trial court, *Silbert, J.*, denied the defendant's motion for summary judgment, and struck the defendant's special defense

to self-insure under subsections (b) and (c) of this section. If the liability for the assessments is insured, the insurance shall be by endorsement to a policy meeting all of the requirements of the Insurance Commissioner, or by a separate policy insuring the liability for the assessments, and otherwise meeting all of the requirements of the Insurance Commissioner. In the case of any employer who files acceptable security guaranteeing the liability for the assessments, failure to pay the assessments, when due, shall result in the denial of the privilege to self-insure under subsections (b) and (c) of this section.

"(d) Any employer to whom a certificate of self-insurance has been issued pursuant to this section who fails or is unable to pay any compensation mandated by the provisions of this chapter, thereby requiring payment from the Second Injury Fund pursuant to section 31-355, shall be prohibited from self-insuring his liability under this chapter for a period of ten years from the date of the payment. The employer shall be required during the ten-year period to insure his full liability under this part, exclusive of any liability resulting from the terms of section 31-284b, in any stock or mutual companies or associations that are or may be authorized to take such risks in this state. Failure to so insure his liability shall result in the denial of the privilege of doing business in this state.

"(e) Whenever an employer fails to comply with the requirements of subsection (b) of this section, the Attorney General may bring a civil action in the superior court for the judicial district of Hartford to enjoin the employer, until such time as he fully complies with such requirements, from entering into any contracts of employment as a result of which he will employ additional employees.

"(f) Each employer subject to the provisions of this chapter shall post, in a conspicuous place, a notice of the availability of compensation, in type of not less than ten-point boldface. The notice shall contain, at a minimum, the information required by regulations adopted pursuant to section 31-279."

Although the legislature has made technical changes to § 31-284 since 1988, the time of the plaintiff's injury in this case, the statute remains substantively the same. Therefore, all references to § 31-284 are to the current revision of the statute.

of immunity under the act. Thereafter, the trial court, *Pittman, J.*, rendered judgment on the verdict in favor of the plaintiff.[4]

The jury reasonably could have found the following facts. At the time of the incident underlying this case, the plaintiff was a medical intern in the second month of her first year in the residency program[5] at Yale-New Haven Hospital (hospital), and a graduate student at the defendant, Yale University d/b/a Yale University School of Medicine.

To put the facts that follow in the proper context, we describe at the outset the incident that caused the plaintiff's injury and a brief summary of the procedure that she was performing at the time. The plaintiff sustained her injuries as a result of her attempt to perform an arterial line insertion during her rotation in the hospital's medical intensive care unit. An arterial line insertion requires the insertion of a hollow needle, called a stylet, and a catheter, which is a thin flexible tube, into a patient's artery in order to permit monitoring of the patient's blood pressure and to obtain samples of the patient's blood. If the artery is punctured by the needle, blood will flow into a clear plastic cap located at the top of the needle—a result known as a flashback. If the catheter is inserted properly into the artery, blood

---

[4] The trial court also rendered judgment in favor of the intervening plaintiff, Yale-New Haven Hospital, for reimbursement of its payments of workers' compensation benefits to the plaintiff.

[5] "A residency training program provides medical school graduates with the clinical training necessary for board certification in specialty or subspecialty areas. . . . A residency is, in many respects, part of an educational continuum begun in medical school. See S. Reuter, 'Professional Liability in Postgraduate Medical Education,' 15 J. Legal Med. 485 [1994] ('[r]esidents are physicians in transition'). The ultimate objective of the residency program is to educate the physician in the healing arts. Rather than relying on book study alone, a residency program achieves this result by involving the physician in day-to-day patient care and specialized clinical activities. Id., 487." *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 587, 687 A.2d 111 (1996).

will start to come out of the hub, the now-open end of the catheter, once the needle is withdrawn. A pressure transducer is then hooked up to the catheter.

A three day orientation period for the residency program began on June 20, 1988. Shortly thereafter, the plaintiff's first rotation in the residency program began in a general medicine program at the hospital, called the Fitkin Service. Deborah Erenthal, a senior resident physician at the time of the events at issue, was the plaintiff's supervisor during that rotation. At some time during that approximately four week rotation, Erenthal directed the plaintiff to attempt her first arterial line insertion.[6] The plaintiff told Erenthal that she had never performed one, and Erenthal instructed her to make the attempt anyway and to let Erenthal know if there was any problem. During this unsupervised attempt,[7] the plaintiff punctured the artery, as evidenced by a flashback, and withdrew the needle in order to determine whether the catheter was in the artery. When no blood came out of the catheter, the plaintiff understood that to mean that she had been unable to cannulate the artery, or thread the catheter into the artery. She then reinserted the needle in order to manipulate the catheter into the artery, and was again unsuccessful and removed the catheter. After making another attempt using a new catheter kit, the plaintiff still could not cannulate the artery, and called Erenthal, who finished the procedure outside the presence of the plaintiff, who had been paged out of the room. After her rotation in the Fitkin Service, the plaintiff spent approximately four weeks at the West Haven Veterans Administration

---

[6] Although, while in medical school at the University of Chicago, the plaintiff had been present on several occasions when an arterial line insertion was performed, she had never performed an arterial line insertion prior to joining the residency program.

[7] The only individuals present during this attempt were the plaintiff, the patient and a nurse.

Hospital, where she did not perform any arterial line insertions.

Thereafter, on August 15, 1988, the plaintiff began a rotation at the hospital's medical intensive care unit. Alison Heald, a third year resident physician, was the plaintiff's supervisor during this rotation. On August 16, 1988, Heald asked the plaintiff to perform an arterial line insertion. Because the plaintiff had never performed one successfully before, she asked Heald to accompany her, which Heald did. Heald described to the plaintiff a method of the procedure by which one punctures the artery, punctures the back wall of the artery upon flashback, then advances the catheter into the artery, and withdraws the needle and holds it in one's hand. Heald did not describe how to control the bleeding once the catheter was in the artery. The plaintiff attempted the procedure, but because she was unable to cannulate the artery, Heald took over and completed the procedure. The plaintiff observed Heald: puncture the artery; get the flashback; advance the needle through the back wall of the artery until there was no more blood coming back; withdraw the needle and hold it in her hand near the catheter; thread the catheter into the artery; put the needle down; and then hook up the transducer. Heald did not describe to the plaintiff how she controlled the bleeding.

Later that day, Heald instructed the plaintiff to attempt another arterial line insertion. During this attempt, with Heald present at the plaintiff's request, the plaintiff inserted the needle into the artery, experienced the flashback, advanced the needle through the back arterial wall, removed the needle and held it in her hand, and attempted to thread the catheter into the artery. No blood, however, came out of the hub of the catheter when the plaintiff removed the needle from it, indicating to the plaintiff that the catheter was not properly positioned in the artery. In Heald's presence,

the plaintiff reinserted the needle in order to reposition the catheter. Because she was still unsuccessful in threading the catheter into the artery, however, she removed the needle and the catheter. There was no discussion between the plaintiff and Heald regarding the reinsertion of the needle.

The plaintiff then began the procedure again with a new catheter kit and completed the procedure successfully. During this attempt, still in Heald's presence, the plaintiff had removed the needle from the catheter and held it in her hand, close to the opening of the catheter. When she did so, blood came out of the catheter at a very slow pace because the patient had an unusually low blood pressure. The plaintiff then hooked up the pressure transducer to the catheter. There was no further discussion with respect to the methods employed by the plaintiff during that attempt.

On August 18, 1988, Heald directed the plaintiff to perform an arterial line insertion without her supervision[8] on a patient known to suffer from acquired immune deficiency syndrome (AIDS). During this attempt, the plaintiff inserted the needle into the artery, advanced the catheter, withdrew the needle from the catheter and kept it close to the opening of the catheter. Immediately upon the plaintiff's withdrawing of the needle, the patient's blood began spurting out.[9] In order to stop the bleeding, the plaintiff placed her thumb over the top of the catheter and, in the course of doing so, pricked her thumb on the needle, which was contaminated with the patient's blood. After attempting to clean her injured hand, the plaintiff completed the arterial line insertion. As a result of the puncture, the plaintiff developed the HIV infection.[10]

---

[8] During this attempt, there were two nurses in the patient's room. At that time, the hospital did not permit nurses to perform arterial line insertions.

[9] The parties stipulated at trial that the patient had normal blood pressure.

[10] The parties stipulated at trial that the plaintiff's HIV infection resulted from the puncture.

Thereafter, the plaintiff brought this action against the defendant alleging negligence.[11] The hospital intervened as a coplaintiff, pursuant to General Statutes

[11] The plaintiff, in her amended complaint, made the following allegations in support of her negligence claim: "The injuries sustained by the plaintiff . . . were caused by the failure of the defendant . . . to properly and adequately train, supervise and evaluate the plaintiff . . . under all of the circumstances then and there existing in that it:

"a. failed to adequately and properly supervise and train the plaintiff;

"b. failed to adequately and properly teach, train and demonstrate to the plaintiff the proper performance of arterial line insertions;

"c. failed to adequately and properly instruct the plaintiff in techniques to avoid exposure to patient's blood during arterial line insertions;

"d. failed to correct the plaintiff's improper technique used in inserting arterial lines;

"e. failed to adequately and properly instruct the plaintiff in techniques to avoid needle punctures with contaminated blood during arterial line insertions;

"f. ordered the plaintiff to insert an arterial line in an AIDS patient without adequate training;

"g. ordered the plaintiff to insert an arterial line in an AIDS patient without supervision;

"h. failed to assess the plaintiff's ability to insert an arterial line prior to ordering the plaintiff to perform said procedure;

"i. knew or should have known that the plaintiff was not competent to perform the insertion of an arterial line but ordered the plaintiff to perform said procedure on an AIDS patient;

"j. failed to adequately train the plaintiff regarding safety procedures to be employed when inserting arterial lines;

"k. failed to instruct residents such as the plaintiff to decline to undertake procedures where competence was lacking;

"l. failed to train more senior residents in the proper instruction of residents under their supervision;

"m. knew or should have known that the plaintiff was likely to be exposed to HIV infection by the improper insertion of arterial lines without proper training but failed to warn the plaintiff of the risk of such exposure;

"n. coerced or otherwise pressured the plaintiff to undertake the performance of procedures regardless of competence;

"o. failed to provide a safe work environment;

"p. failed to provide graded responsibility to residents in the program, such as the plaintiff, in accordance with their current competence;

"q. failed to consider the welfare of the residents, such as the plaintiff, in assigning them to high risk patients without adequate training."

The plaintiff, in a second count in her complaint, also had alleged violations of the Connecticut Unfair Trade Practices Act; General Statutes § 42-110a et seq.; but subsequently withdrew that claim during trial.

§ 31-293,[12] to assert its right to recover past and future

[12] General Statutes § 31-293 provides: "Liability of third persons to employer and employee. Limitations on liability of architects and engineers. Limitations on liability of insurers, self-insurance service organizations and unions relating to safety matters. (a) When any injury for which compensation is payable under the provisions of this chapter has been sustained under circumstances creating in a person other than an employer who has complied with the requirements of subsection (b) of section 31-284, a legal liability to pay damages for the injury, the injured employee may claim compensation under the provisions of this chapter, but the payment or award of compensation shall not affect the claim or right of action of the injured employee against such person, but the injured employee may proceed at law against such person to recover damages for the injury; and any employer or the custodian of the Second Injury Fund, having paid, or having become obligated to pay, compensation under the provisions of this chapter may bring an action against such person to recover any amount that he has paid or has become obligated to pay as compensation to the injured employee. If the employee, the employer or the custodian of the Second Injury Fund brings an action against such person, he shall immediately notify the others, in writing, by personal presentation or by registered or certified mail, of the action and of the name of the court to which the writ is returnable, and the others may join as parties plaintiff in the action within thirty days after such notification, and, if the others fail to join as parties plaintiff, their right of action against such person shall abate. In any case in which an employee brings an action against a party other than an employer who failed to comply with the requirements of subsection (b) of section 31-284, in accordance with the provisions of this section, and the employer is a party defendant in the action, the employer may join as a party plaintiff in the action. The bringing of any action against an employer shall not constitute notice to the employer within the meaning of this section. If the employer and the employee join as parties plaintiff in the action and any damages are recovered, the damages shall be so apportioned that the claim of the employer, as defined in this section, shall take precedence over that of the injured employee in the proceeds of the recovery, after the deduction of reasonable and necessary expenditures, including attorneys' fees, incurred by the employee in effecting the recovery. The rendition of a judgment in favor of the employee or the employer against the party shall not terminate the employer's obligation to make further compensation which the commissioner thereafter deems payable to the injured employee. If the damages, after deducting the employee's expenses as provided in this subsection, are more than sufficient to reimburse the employer, damages shall be assessed in his favor in a sum sufficient to reimburse him for his claim, and the excess shall be assessed in favor of the injured employee. No compromise with the person by either the employer or the employee shall be binding upon or affect the rights of the other, unless assented to by him. For the purposes of this section, the claim of the employer shall consist of (1) the

workers' compensation payments that it was obligated

amount of any compensation which he has paid on account of the injury which is the subject of the suit and (2) an amount equal to the present worth of any probable future payments which he has by award become obligated to pay on account of the injury. The word 'compensation', as used in this section, shall be construed to include incapacity payments to an injured employee, payments to the dependents of a deceased employee, sums paid out for surgical, medical and hospital services to an injured employee, the burial fee provided by subdivision (1) of subsection (a) of section 31-306, payments made under the provisions of sections 31-312 and 31-313, and payments made under the provisions of section 31-284b in the case of an action brought under this section by the employer or an action brought under this section by the employee in which the employee has alleged and been awarded such payments as damages. Each employee who brings an action against a party in accordance with the provisions of this subsection shall include in his complaint (A) the amount of any compensation paid by the employer or the Second Injury Fund on account of the injury which is the subject of the suit and (B) the amount equal to the present worth of any probable future payments which the employer or the Second Injury Fund has, by award, become obligated to pay on account of the injury. Notwithstanding the provisions of this subsection, when any injury for which compensation is payable under the provisions of this chapter has been sustained under circumstances creating in a person other than an employer who has complied with the requirements of subsection (b) of section 31-284, a legal liability to pay damages for the injury and the injured employee has received compensation for the injury from such employer, its workers' compensation insurance carrier or the Second Injury Fund pursuant to the provisions of this chapter, the employer, insurance carrier or Second Injury Fund shall have a lien upon any judgment received by the employee against the party or any settlement received by the employee from the party, provided the employer, insurance carrier or Second Injury Fund shall give written notice of the lien to the party prior to such judgment or settlement.

"(b) When an injury for which compensation is payable under the provisions of this chapter is determined to be the result of a motor vehicle accident or other accident or circumstance in which a third person other than the employer was negligent and the claim is subrogated by the employer or its workers' compensation insurance carrier, the insurance carrier shall provide a rate adjustment to the employer's workers' compensation policy to reflect the recovery of any compensation paid by the insurance carrier prior to subrogation.

"(c) Notwithstanding the provisions of subsection (a) of this section, no construction design professional who is retained to perform professional services on a construction project, or any employee of a construction design professional who is assisting or representing the construction design professional in the performance of professional services on the site of the construc-

to make as a result of the injuries alleged in the plaintiff's action against the defendant.

The defendant asserted two special defenses. In the first special defense, the defendant alleged that the plaintiff's own negligence proximately caused her injuries. In the second special defense, the defendant alleged that, because the hospital was obligated to provide workers' compensation benefits to the plaintiff as a result of the same incident and injuries alleged in her complaint against the defendant, it enjoyed immunity from suit under the exclusivity provision of the act; General Statutes § 31-284 (a);[13] by virtue of its participa-

tion project, shall be liable for any injury on the construction project for which compensation is payable under the provisions of this chapter, unless responsibility for safety practices is specifically assumed by contract. The immunity provided by this subsection to any construction design professional shall not apply to the negligent preparation of design plans or specifications. For the purposes of this subsection 'construction design professional' means (1) any person licensed as an architect under the provisions of chapter 390, (2) any person licensed, or exempted from licensure, as an engineer under the provisions of chapter 391, or (3) any corporation organized to render professional services through the practice of either or both of such professions in this state.

"(d) Notwithstanding the provisions of subsection (a) of this section, the furnishing of or the failure to furnish safety inspections or safety advisory services (1) by an insurer incident to providing workers' compensation insurance to an employer, (2) pursuant to a contract providing for safety inspections or safety advisory services between an employer and a self-insurance service organization incident to providing workers' compensation related services or (3) by a union representing employees of the employer, shall not subject the insurer or self-insurance service organization or their agents or employees, or the union, its members or the members of its safety committee, to third party liability for damages for injury, death or loss resulting therefrom unless the liability arises from a breach of a duty of fair representation of its members by a union. The immunity from liability extended under this subsection shall not be extended to any insurer or self-insurance service organization other than where the immunity is incident to the provision of workers' compensation insurance or workers' compensation related services."

Although § 31-293 has been amended since 1988, the time of the plaintiff's injury in this case, the changes are not relevant to this opinion. Therefore, all references to § 31-293 are to the current revision of the statute.

[13] See footnote 3 of this opinion for the text of § 31-284 (a).

tion in a joint venture with the hospital, namely, the residency program.[14]

The defendant moved for summary judgment, claiming that the plaintiff's claim sounded in educational malpractice, which the trial court, *Silbert, J.,* denied. The plaintiff moved to strike the defendant's second special defense contending that: (1) joint ventures do not fall within the definition of an "employer" in General Statutes § 31-275 (10);[15] (2) the defendant was not the

---

[14] The second revised special defense alleged: "Plaintiff was injured on August 18, 1988, while [she] was participating in a residency program in internal medicine. Although plaintiff's complaint alleges in paragraph 1 that [the defendant] was operating this program, the program was in fact operated by plaintiff's direct employer, [the hospital], and by [the defendant]. Plaintiff's injury occurred in the course of [her] work in that residency program and at the same time arose out of and within the scope of [her] direct employment by [the hospital]. [The hospital] has paid, and will continue to pay, workers' compensation benefits to plaintiff and, therefore, it enjoys immunity from suit by reason of . . . § 31-284 (a) of the [act], which provides that all rights and claims between employer and employees are abolished other than the rights and claims given by the [act]. Although plaintiff was not a direct employee of [the defendant], [her] claims against [the defendant] in this action are likewise barred by . . . § 31-284 (a) because at the time of [her] injury the residency program in internal medicine was, and had been for many years, a joint adventure, venture, enterprise or undertaking between [the hospital] and [the defendant] in which they each had a voice and in which they combined their respective property, money, efforts, skill and knowledge in the common purpose of operating the internal medicine residency program to educate and train participants such as the plaintiff."

[15] General Statutes § 31-275 (10) provides: " 'Employer' means any person, corporation, limited liability company, firm, partnership, voluntary association, joint stock association, the state and any public corporation within the state using the services of one or more employees for pay, or the legal representative of any such employer, but all contracts of employment between an employer employing persons excluded from the definition of employee and any such employee shall be conclusively presumed to include the following mutual agreements between employer and employee: (A) That the employer may accept and become bound by the provisions of this chapter by immediately complying with section 31-284; (B) that, if the employer accepts the provisions of this chapter, the employee shall then be deemed to accept and be bound by such provisions unless the employer neglects or refuses to furnish immediately to the employee, on his written request, evidence of compliance with section 31-284 in the form of a certificate from

plaintiff's employer because it did not pay her for her services; (3) the defendant is not entitled to immunity because it did not obtain workers' compensation insurance as required by § 31-284 (b);[16] (4) the defendant is not a joint venturer because it failed to allege a profit motive in its affiliation with the hospital; and (5) the plaintiff was a student and not a teacher, and therefore was not employed within the scope of the operation of the residency program.

The trial court, *Silbert, J.*, granted the plaintiff's motion to strike the defendant's second special defense.

the commissioner, the Insurance Commissioner or the insurer, as the case may be; (C) that the employee may, at any time, withdraw his acceptance of, and become released from, the provisions of this chapter by giving written or printed notice of his withdrawal to the commissioner and to the employer, and the withdrawal shall take effect immediately from the time of its service on the commissioner and the employer; and (D) that the employer may withdraw his acceptance and the acceptance of the employee by filing a written or printed notice of his withdrawal with the commissioner and with the employee, and the withdrawal shall take effect immediately from the time of its service on the commissioner and the employee. The notices of acceptance and withdrawal to be given by an employer employing persons excluded from the definition of employee and the notice of withdrawal to be given by the employee, as provided in this subdivision, shall be served upon the commissioner, employer or employee, either by personal presentation or by registered or certified mail. In determining the number of employees employed by an individual, the employees of a partnership of which he is a member shall not be included. A person who is the sole proprietor of a business may accept the provisions of this chapter by notifying the commissioner, in writing, of his intent to do so. If such person accepts the provisions of this chapter he shall be considered to be an employer and shall insure his full liability in accordance with subdivision (2) of subsection (b) of section 31-284. Such person may withdraw his acceptance by giving notice of his withdrawal, in writing, to the commissioner. Any person who is a partner in a business shall be deemed to have accepted the provisions of this chapter and shall insure his full liability in accordance with subdivision (2) of subsection (b) of section 31-284, unless the partnership elects to be excluded from the provisions of this chapter by notice, in writing and by signed agreement of each partner, to the commissioner."

Although § 31-275 has been amended since 1988, the time of the plaintiff's injury in this case, the changes are not relevant to this opinion. Therefore, all references to § 31-275 are to the current revision of the statute.

[16] See footnote 3 of this opinion for the text of § 31-284 (b).

The court concluded that the defendant was not entitled to immunity under the act on the grounds that: (1) joint ventures do not fall within the purview of the definition of "employer" under § 31-275 (10) of the act; (2) the affiliation between the defendant and the hospital did not have a profit motive, as the defendant acknowledged at oral argument and in its pleadings, and therefore did not constitute a joint venture; (3) the defendant neither procured, contributed to, nor reimbursed the hospital for its workers' compensation coverage relating to the plaintiff; (4) the defendant did not pay the plaintiff's salary; (5) the defendant did not comply with the provisions of § 31-284 (b); and (6) the plaintiff's injury did not occur while performing the business of the affiliation between the defendant and the hospital, namely, to educate and train students; instead, the court ruled that the plaintiff's participation in the affiliation was that of a student, and not an employee.

Upon the trial, the court, *Pittman, J.*, denied the defendant's motion for a directed verdict and, following the jury's verdict in favor of the plaintiff, also denied the defendant's motion for judgment notwithstanding the verdict and for a new trial, and rendered judgment for the plaintiff. This appeal followed.

I

## COGNIZABILITY OF THE PLAINTIFF'S CLAIM

We first consider the defendant's claim that the jury's verdict should be set aside and judgment rendered for it because, by permitting the adjudication of the plaintiff's claim, the trial court improperly recognized a tort of negligent resident education, which, according to the defendant: (1) previously has been rejected by this court in *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 591–92, 687 A.2d 111 (1996); and (2) does not satisfy the uniform test that this court articulated in *Zamstein* v. *Marvasti*, 240 Conn. 549, 558, 692 A.2d 781 (1997),

for recognizing new causes of action. The defendant argues, in the alternative, that it is entitled to a new trial because the trial court impermissibly permitted specifications in the complaint that alleged educational malpractice to be submitted to the jury. The plaintiff argues, to the contrary, that her claim does not sound in educational malpractice, but is instead akin to the negligence claim recognized by this court in *Kirchner* v. *Yale University*, 150 Conn. 623, 626, 192 A.2d 641 (1963). We agree with the plaintiff.

Before reaching the merits of the arguments, we briefly address the standard by which we review this claim. In this claim, the defendant challenges the propriety of the trial court's legal conclusions. It is well established that when we review a trial court's legal conclusions, those conclusions are subject to de novo review by this court. *Connecticut Associated Builders & Contractors* v. *Hartford*, 251 Conn. 169, 177, 740 A.2d 813 (1999); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 752, 601 A.2d 1005 (1992).

A

We first address the defendant's argument that the trial court improperly submitted to the jury the plaintiff's claim, the cognizability of which, according to the defendant, was rejected by this court in *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 574. The trial court, *Silbert, J.*, concluded that the plaintiff's claim was not an educational malpractice claim, but rather a claim of negligence, similar to that in *Kirchner* v. *Yale University*, supra, 150 Conn. 626. In essence, our task is to determine whether the plaintiff's claim sounds in educational malpractice, and is therefore barred by *Gupta*, or whether the plaintiff's claim is appropriately governed by *Kirchner*.

We recently joined those courts that have rejected the cognizability of educational malpractice claims. In

*Gupta* v. *New Britain General Hospital,* supra, 239 Conn. 580, the plaintiff resident physician brought a breach of contract claim against the defendant hospital alleging that he was improperly dismissed from the residency training program, and that such dismissal was a breach of the residency agreement between the plaintiff and the hospital. The hospital based its decision to dismiss the plaintiff on his "inability to make decisions in the operating room, his unwillingness to accept responsibility for errors, and gaps in the plaintiff's 'knowledge base.' " Id., 579. In granting the hospital's motion for summary judgment, the trial court "characterized the decision to dismiss the plaintiff as an academic decision that lay solely within the province of the medical community." (Internal quotation marks omitted.) Id., 581. We affirmed the judgment of the trial court, stating that "[a] residency committee's decision to dismiss a resident physician for poor performance in the clinic mirrors a professor's decision to fail a medical school student for poor performance in the classroom." Id., 587. We rejected the propriety of permitting courts to evaluate such an academic decision as the dismissal of a student based on poor performance. Id., 590–92, 594–95. In short, we concluded that the plaintiff had not stated a cognizable claim. Id., 598.

On the other hand, the plaintiff in *Kirchner* v. *Yale University,* supra, 150 Conn. 630, stated a viable cause of action. In *Kirchner,* the plaintiff brought an action against the defendant university and the supervisor of the woodworking shop at the university to recover damages for personal injuries. Id., 624. The plaintiff, an architectural student at the university, sustained injuries to his hand while operating a machine called a jointer in the university's woodworking shop. Id., 624–25. One specification of negligence in the complaint alleged "a failure to provide necessary rules, regulations and instructions in the use of the jointer, and another

charged a failure to provide a proper type of push block to be used in connection with the operation of the jointer." Id., 626. This court, in reversing the judgment based upon a directed verdict for the defendants, stated: "It was the obligation of the defendants to exercise reasonable care not only to instruct and warn students in the safe and proper operation of the machines provided for their use but also to furnish and have available such appliances, if any, as would be reasonably necessary for the safe and proper use of the machines." Id., 627. We determined that this claim, implicating the duty owed by an educator not to cause physical injury by negligent conduct in the course of instruction, was viable. Id., 628.

We recognize that, at first blush, the distinction between an educational malpractice claim, rejected in *Gupta*, and a cognizable negligence claim arising in the educational context, permitted in *Kirchner*, may not always be clear. We conclude, however, that the distinction lies in the duty that is alleged to have been breached. If the duty alleged to have been breached is the duty to educate effectively, the claim is not cognizable. *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 593–94. If the duty alleged to have been breached is the common-law duty not to cause physical injury by negligent conduct, such a claim is, of course, cognizable. That common-law duty does not disappear when the negligent conduct occurs in an educational setting. This principle underlies this court's decision in *Kirchner*. The duty of an educator or supervisor to use reasonable care so as not to cause physical injury to a trainee during the course of instruction or supervision is not novel.[17]

---

[17] The plaintiff directs our attention to a myriad of cases that demonstrate this principle. See, e.g., *Stehn* v. *Bernarr McFadden Foundations, Inc.*, 434 F.2d 811, 814–15 (6th Cir. 1970) (adult wrestling class student stated cause of action where injury resulted from inadequate instruction and supervision); *Brigham Young University* v. *Lillywhite*, 118 F.2d 836, 841 (1941) (college chemistry student entitled to recover for injury resulting from professor's

We conclude that the duty alleged to have been breached in the present case is essentially the same duty that was implicated in *Kirchner*, namely, the duty not to cause physical harm by negligent conduct. The duty that the plaintiff alleged was breached here is not some general duty to educate her effectively, as was the claim alleged in *Gupta*. Instead, the plaintiff alleged that, in the course of instructing her, the defendant caused her to suffer physical injury as a result of its negligent conduct. Accordingly, we conclude that the plaintiff did not assert an educational malpractice claim, but instead stated a viable negligence claim.

The defendant advances several arguments in support of its claim that the plaintiff's cause of action sounds in educational malpractice. Although these arguments are not entirely without appeal, we do not find them persuasive. We address them in turn.

The defendant argues that the trial court failed to follow *Gupta* v. *New Britain General Hospital*, supra,

inadequate instruction and supervision); *Delbridge* v. *Maricopa County Community College District*, 182 Ariz. 55, 59, 893 P.2d 55 (1994) (college required to exercise reasonable care to protect student from injury); *Ahern* v. *Livermore Union High School District*, 208 Cal. 770, 781, 284 P.2d 1105 (1930) (Preton, J., dissenting) (shop class student entitled to recover for injury based on inadequate instruction and supervision); *Morehouse College* v. *Russell*, 109 Ga. App. 301, 320, 136 S.E. 179 (1964) (estate of college student killed in swimming class entitled to recover based on inadequate instruction and supervision); *Barbin* v. *Louisiana*, 506 So. 2d 888, 893 (La. 1987) (shop class student entitled to recover for injury based on inadequate instruction and supervision); *Garrett* v. *Northwest Mississippi Junior College*, 674 So. 2d 1, 3–4 (Miss. 1996) (same); *Yarborough* v. *City University of New York*, 137 Misc. 2d 282, 285–86, 520 N.Y.S.2d 518 (Ct. Cl. 1987) (adult physical education student entitled to recover for injuries based on inadequate instruction); *DeMauro* v. *Tusculum College, Inc.*, 603 S.W.2d 115, 120 (Tenn. 1980) (student in college golf class entitled to recover if he could prove injury resulted from improper instruction or supervision); *Sewell* v. *London*, 371 S.W.2d 426, 427 (Tex. App. 1963) (shop class student stated cause of action for injury resulting from inadequate supervision and instruction); *Jay* v. *Walla Walla College*, 53 Wash. 2d 590, 597, 335 P.2d 458 (1959) (chemistry lab student entitled to recover for injury caused by teacher's failure to supervise).

239 Conn. 574. The defendant contends that the trial court failed to "[focus] on whether the alleged negligence claimed by [the] plaintiff flowed from or implicated educational decision making and evaluative assessments." Instead, the defendant maintains, the trial court did what we proscribed in *Gupta*, "not merely to make judgments as to the validity of broad educational policies . . . but, more importantly, to sit in review of the day-to-day implementation of these policies." (Internal quotation marks omitted.) Id., 591. As a result, according to the defendant, the trial court improperly submitted all of the seventeen specifications of negligence for the jury's consideration.[18] At the very least, the defendant contends, several specifications allege educational malpractice, however defined.[19] As

[18] The trial court instructed the jury that it could find for the plaintiff if it concluded that she proved that "the defendant was negligent in at least one of the ways alleged."

[19] We briefly address the plaintiff's two part contention that the defendant is not entitled to appellate consideration of this claim. First, the plaintiff points out that the defendant did not properly preserve this claim for appellate review in that it did not: move to strike any of the specifications; request a jury charge limited to the narrower specifications; take exception to the jury instruction regarding all specifications; or make any objection to the submission of all specifications in its motion for a directed verdict or its motion to set aside the verdict. Thus, the plaintiff argues that the aider by verdict doctrine, as applied in *Tedesco* v. *Stamford*, 215 Conn. 450, 576 A.2d 1273 (1990), remanded, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992), allows a verdict, based on poorly worded pleadings, to stand absent surprise or prejudice. The defendant's claim here, however, is essentially that the plaintiff failed to state a viable cause of action. The aider by verdict doctrine does not apply in such a case. We also conclude that this claim was adequately preserved by: the defendant's objections to various specifications in its motion for summary judgment based on educational malpractice arguments; its motion for a directed verdict that incorporated its objections; and its motion to set aside the verdict.

Second, the plaintiff also argues that appellate consideration of this claim on appeal is precluded on the ground that, pursuant to the general verdict rule, as redefined in *Curry* v. *Burns*, 225 Conn. 782, 626 A.2d 719 (1993), the defendant did not request jury interrogatories, so that it cannot show that the jury considered the specifications to which it now objects. In *Curry* v. *Burns*, supra, 801, we concluded that the general verdict rule only applies in the following circumstances: "(1) denial of separate counts of a complaint;

examples, the defendant points to the allegations that it " 'failed to instruct residents such as [the plaintiff] to decline to undertake procedures' " and " 'failed to train more senior residents in the proper instruction of residents under their supervision.' "

It is important to recognize the point at which our proscription in *Gupta*, to which the defendant refers, arose in our analysis. In that case, we already had concluded that the plaintiff's claim sounded in educational malpractice. Having reached that conclusion, our purpose was to determine, in light of public policy considerations, whether educational malpractice was a viable cause of action. We then invoked the policy of judicial noninterference in rejecting the cognizability of such claims. We caution, however, against placing undue weight on specific language of that proscription—for example, "day-to-day implementation"—in order to suggest that an educational institution's conduct on any given day is immune from judicial scrutiny when that conduct causes physical harm.

We acknowledge that the jury in the present case was asked to determine, in part, whether Heald's training and particular aspects of the residency program

(2) denial of separate defenses pleaded as such; (3) denial of separate legal theories of recovery or defense pleaded in one count or defense, as the case may be; (4) denial of a complaint and pleading of a special defense; and (5) denial of a specific defense, raised under a general denial, that had been asserted as the case was tried but that should have been specially pleaded." The plaintiff contends that, if we were to conclude that there were two theories of recovery alleged, the third prong of this analysis applies. The defendant, to the contrary, argues that the general verdict rule does not apply because there are no " 'distinct causes of action,' " but " 'separate factual allegations made in support of a single cause of action,' " and that, therefore, appellate consideration of its claim of trial court error is not precluded. Although we find it difficult to square the defendant's argument—that the plaintiff only states a single cause of action—with its argument that at least some of the allegations in the plaintiff's complaint sounded in educational malpractice, we conclude that the general verdict rule does not apply because the plaintiff has asserted only one legal theory of recovery.

were adequate. We also acknowledge that these and similar assessments, raised by the plaintiff's allegations of negligence, require the kind of judicial oversight of the educational process that, for policy reasons, we eschewed in *Gupta*. What tips the balance here, however, and what distinguishes this case from *Gupta*, is the *result* of the claimed educational inadequacy. When the claimed result is an inadequate education, there is no viable claim because we are unwilling to recognize such a legal duty as a matter of public policy. *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 590–95. When, however, the result is physical harm, as in the present case, we *are* willing to recognize the claim because it falls within the traditionally recognized duty not to cause physical harm by negligent conduct. The fact that the harm is caused in an educational setting is not sufficient to *remove* the claim from that traditionally cognizable claim. Similarly, the fact that some of the allegations that support a claim of a failure of a defendant's duty not to cause physical injury by negligent conduct in the course of instruction may mirror some of those that would be alleged to support an educational malpractice claim, does not require the conclusion that the cause of action is one sounding in educational malpractice.

The defendant next contends that the present case is not controlled by *Kirchner* v. *Yale University*, supra, 150 Conn. 623, because, the defendant asserts, "there is nothing in [*Kirchner*] to indicate that the plaintiff challenged educational techniques, decision making or evaluative assessments in any way." Instead, the defendant likens the injured plaintiff in *Kirchner* to a student whose chair collapses during class. Neither the specifications of negligence in the complaint in *Kirchner*, nor the court's treatment of the case, however, supports the defendant's contention. As stated previously, the plaintiff in *Kirchner* alleged that the defendants failed

"to provide necessary rules, regulations and instructions in the use of the jointer . . . ." Id., 626. The court stated that the defendants had a duty "to exercise reasonable care . . . to instruct and warn students in the safe and proper operation of the machines . . . ." Id., 627. To liken the plaintiff in *Kirchner* to a student whose chair collapses during class, as the defendant does, is to ignore what the court in *Kirchner* recognized: the common-law duty not to cause physical injury by negligent conduct in the course of instruction.

The defendant also argues that, in concluding that *Kirchner* governed the present case, the trial court improperly relied on two "irrelevant" factors: (1) the presence of physical injury; and (2) the fact that the plaintiff's claim was " 'precise,' " not " 'broad.' " The presence of physical injury, however, hardly can be considered irrelevant to the common-law duty not to cause such injury by negligent conduct. Similarly, the fact that the plaintiff made narrow, rather than overly broad, allegations is not irrelevant to the validity of her claim.

Finally, the defendant argues that, in distinguishing between educational malpractice claims and other negligence claims, the trial court improperly ignored whether the alleged negligence occurred in an environment where specialized external regulators provide oversight of educational standards with respect to residency training programs. The defendant contends, and suggests that our decision in *Gupta* stands for, the proposition that the existence of independent regulatory bodies that oversee medical residency programs[20] obviates the need for the judicial establishment of standards of care because those bodies serve as a protection for

---

[20] The defendant cites to the Accreditation Council of Graduate Medical Education, the American Board of Internal Medicine, and the American Medical Association.

medical residents and are better equipped to evaluate the effectiveness of such programs. We disagree.

Critical to a proper understanding of our decision in *Gupta* is that the duty alleged to have been breached in that case was the duty to provide an adequate, effective residency program. On the basis of that understanding, in determining whether such a novel claim was cognizable, we referred to external regulators of graduate medical education as being appropriate evaluators of the effectiveness of such a program. *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 592. In other words, we relied on the existence of external regulators as one policy consideration in concluding that judicial noninterference was particularly appropriate where the alleged breach involved the duty to educate effectively, specifically, the failure to provide an adequate residency program. Id. The existence of external regulators, however, does not have the same weight where the alleged breach involves the well established common-law duty not to cause physical harm by negligent conduct.

## B

The defendant also contends that the plaintiff's cause of action does not satisfy the requirements set forth in *Zamstein* v. *Marvasti*, supra, 240 Conn. 558, and refined by our decision in *Jaworski* v. *Kiernan*, 241 Conn. 399, 407, 696 A.2d 332 (1997), for determining, when considering novel claims, whether a legal duty exists. In *Zamstein*, we stated that "the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would 'anticipate that harm of the general nature of that suffered was likely to result,' and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negli-

gent conduct should extend to the particular conse-quences or particular plaintiff in the case."[21] *Zamstein* v. *Marvasti*, supra, 558. Because of our conclusion in part I A of this opinion that the plaintiff's claim alleges the breach of a previously recognized duty and, there-fore, does not seek recovery based on a novel claim, the analysis set forth in *Zamstein* does not apply to the present case.

The defendant also argues that in *Gupta* v. *New Brit-ain General Hospital*, supra, 239 Conn. 574, this court applied a version of this legal duty analysis in the con-text of medical resident education and concluded that the plaintiff did not state a viable cause of action. The court in *Gupta*, however, engaged in such an analysis because of the novelty of the duty alleged to have been breached in that case, namely, the duty to educate effec-tively. Id., 590–93. In the present case, because we are not presented with the task of determining whether to recognize a new duty, the legal duty analysis set forth in *Zamstein* v. *Marvasti*, supra, 240 Conn. 558, and *Jaworski* v. *Kiernan*, supra, 241 Conn. 407, is inapplica-ble.

II

THE MOTION TO STRIKE

We next consider the defendant's claim that the trial court, *Silbert, J.*, improperly granted the plaintiff's motion to strike its special defense, which asserted immunity from suit under the exclusivity provision of

---

[21] In *Jaworski* v. *Kiernan*, supra, 241 Conn. 407, we stated that the factors to consider in the public policy portion of the analysis are: "(1) the normal expectations of participants in the sport in which the plaintiff and the defendant were engaged; (2) the public policy of encouraging continued vigorous participation in recreational sporting activities while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions."

the act. General Statutes § 31-284 (a).[22] We agree with the defendant.

We begin by setting out the well established standard of review in an appeal from the granting of a motion to strike. "Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on the [plaintiff's motion] is plenary. See *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232–33, 680 A.2d 127 (1996) [cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997)]. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. *Bohan* v. *Last*, 236 Conn. 670, 674, 674 A.2d 839 (1996); see also *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108–109, 491 A.2d 368 (1985). Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. *Waters* v. *Autuori*, 236 Conn. 820, 826, 676 A.2d 357 (1996). Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. *Clohessy* v. *Bachelor*, 237 Conn. 31, 33 n.4, 675 A.2d 852 (1996)." (Internal quotation marks omitted.) *Knight* v. *F. L. Roberts & Co.*, 241 Conn. 466, 470–71, 696 A.2d 1249 (1997). "It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . *Amodio* v. *Cunningham*, 182 Conn. 80, 83, 438 A.2d 6 (1980). Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically. . . . *Edwards* v. *Tardif*, 240 Conn. 610, 620, 692 A.2d 1266 (1997)." (Internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*,

[22] See footnote 3 of this opinion for the text of § 31-284 (a).

243 Conn. 66, 100, 700 A.2d 655 (1997) (*Berdon, J.*, concurring and dissenting).

A

With respect to this claim, the defendant first argues that the trial court improperly concluded as a matter of law that joint ventures do not fall within the definition of "employer" under the act and, therefore, cannot seek shelter under the act's exclusivity provision. Section 31-275 (10) of the act defines "employer" as "any person, corporation, limited liability company, firm, partnership, voluntary association, joint stock association, the state and any public corporation within the state using the services of one or more employees for pay, or the legal representative of any such employer . . . ." Under the act's exclusivity provision, "[a]n employer who complies with the requirements of subsection (b) of this section shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment . . . . All rights and claims between an employer who complies with the requirements of subsection (b) of this section and employees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment are abolished other than rights and claims given by this chapter . . . ." General Statutes § 31-284 (a).

The defendant contends that the definition of employer encompasses joint ventures because they fall within either the term " 'partnership' " or " 'person,' " or both. The plaintiff contends, to the contrary, that a joint venture may not be considered an employer under § 31-275 (10) because the itemized list of covered employers does not include the term "joint venture." We agree with the defendant in part, and conclude that a joint venture may be considered an employer for

workers' compensation purposes. We base our conclusion on the principle that the expansive language of the act should be broadly construed, the similarities between joint ventures and partnerships, and the fact that a contrary conclusion could impede the act's remedial purpose.

Whether a joint venture may be an employer under the act presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, [supra, 220 Conn. 755–56]." (Internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 258–59, 736 A.2d 104 (1999).

The language governing who may be deemed an employer for workers' compensation purposes is expansive. Section 31-275 (10) expressly includes within its ambit "any person, corporation, limited liability company, firm, partnership, voluntary association, joint stock association, the state and any public corporation within the state using the services of one or more employees for pay, or the legal representative of any such employer . . . ." The definition of employer has remained largely unchanged since the act's enactment in 1913. In its original form, the act defined

" 'employer' " as "any natural person, corporation, firm, partnership, or joint stock association, the state, and any public corporation within the state using the services of another for pay; it includes also the legal representative of any such employer." Public Acts 1913, c. 138, part B, § 43. The scope of this definition subsequently was amended to change "any natural person" to "any person"; Public Acts 1915, c. 288, § 22; and to include "voluntary association"; Public Acts 1921, c. 306, § 11; and "limited liability company"; Public Acts 1995, No. 95-79, § 117. Unlike the counterpart definition of "employee" contained in § 31-275 (9),[23] which excepts

[23] General Statutes § 31-275 (9) provides: "(A) 'Employee' means any person who:

"(i) Has entered into or works under any contract of service or apprenticeship with an employer, whether the contract contemplated the performance of duties within or without the state;

"(ii) Is a sole proprietor or business partner who accepts the provisions of this chapter in accordance with subdivision (10) of this section;

"(iii) Is elected to serve as a member of the General Assembly of this state;

"(iv) Is a salaried officer or paid member of any police department or fire department;

"(v) Is a volunteer police officer, whether the officer is designated as special or auxiliary, upon vote of the legislative body of the town, city or borough in which the officer serves; or

"(vi) Is an elected or appointed official or agent of any town, city or borough in the state, upon vote of the proper authority of the town, city or borough, including the elected or appointed official or agent, irrespective of the manner in which he is appointed or employed. Nothing in this subdivision shall be construed as affecting any existing rights as to pensions which such persons or their dependents had on July 1, 1927, or as preventing any existing custom of paying the full salary of any such person during disability due to injury arising out of and in the course of his employment.

"(B) 'Employee' shall not be construed to include:

"(i) Any person to whom articles or material are given to be treated in any way on premises not under the control or management of the person who gave them out;

"(ii) One whose employment is of a casual nature and who is employed otherwise than for the purposes of the employer's trade or business;

"(iii) A member of the employer's family dwelling in his house; but, if, in any contract of insurance, the wages or salary of a member of the employer's family dwelling in his house is included in the payroll on which the premium is based, then that person shall, if he sustains an injury arising out of and in the course of his employment, be deemed an employee and compensated

from its purview certain persons, the definition of "employer" contains no provision that makes express exceptions from its broad scope.

The legislative history of § 31-275 (10) is consistent with the notion that the act, broadly construed, is capacious enough to include a joint venture as an employer under the act. During the committee hearings on the bill that ultimately became chapter 138 of the 1913 Public Acts, Professor Willard C. Fisher, an economist at Wesleyan University who had been engaged by the standing committees on judiciary and labor to assist in drafting the act, remarked that "the law ought to be as wide as possible in its scope; there ought to be no employment left out that can practicably be included." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1913 Sess., p. 197; see A. Grillo, "Fifty Years of Workmen's Compensation—An Historical Review," 38 Conn. B.J. 239, 244–45 (1964). Moreover, there is nothing in the legislative history to preclude, as a matter of law, a joint venture from being considered an employer under the act.

It is well settled that the act is to be construed broadly in order to serve its remedial purpose. *Dowling* v. *Slotnik*, 244 Conn. 781, 800, 712 A.2d 396, cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct.

---

in accordance with the provisions of this chapter;

"(iv) Any person engaged in any type of service in or about a private dwelling provided he is not regularly employed by the owner or occupier over twenty-six hours per week;

"(v) An employee of a corporation who is a corporate officer and who elects to be excluded from coverage under this chapter by notice in writing to his employer and to the commissioner; or

"(vi) Any person who is not a resident of this state but is injured in this state during the course of his employment, unless such person (I) works for an employer who has a place of employment or a business facility located in this state at which such person spends at least fifty per cent of his employment time, or (II) works for an employer pursuant to an employment contract to be performed primarily in this state."

542, 142 L. Ed. 2d 451 (1998). "Connecticut first adopted a statutory scheme of workers' compensation in 1913. The purpose of the [act] . . . General Statutes § 31-275 et seq.; is to provide compensation for injuries arising out of and in the course of employment, regardless of fault. *Klapproth* v. *Turner*, 156 Conn. 276, 279, 240 A.2d 886 (1968). Under the statute, the employee surrenders his right to bring a common law action against the employer, thereby limiting the employer's liability to the statutory amount. . . . In return, the employee is compensated for his or her losses without having to prove liability. . . . In a word, these statutes compromise an employee's right to a common law tort action for work related injuries in return for *relatively quick* and certain compensation. . . . *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 381, 698 A.2d 859 (1997). The intention of the framers of the act was to establish *a speedy*, effective and inexpensive method for determining claims for compensation. *Taylor* v. *St. Paul's Universalist Church*, 109 Conn. 737, 147 A. 671 [1929]. . . . *Chieppo* v. *Robert E. McMichael, Inc.*, 169 Conn. 646, 653, 363 A.2d 1085 (1975)." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Casey* v. *Northeast Utilities*, 249 Conn. 365, 378–79, 731 A.2d 294 (1999).

Moreover, the similarities between joint ventures and partnerships, which are expressly included in § 31-275 (10), are significant. Our case law has long recognized that a joint venture, also referred to as a joint adventure or joint enterprise, exists "where two or more parties combine their property, money, efforts, skill or knowledge in some common undertaking . . . ." (Internal quotation marks omitted.) *Roberts* v. *Weiner*, 137 Conn. 668, 671, 81 A.2d 115 (1951); *Lesser* v. *Smith*, 115 Conn. 86, 89, 160 A. 302 (1932); *Dolan* v. *Dolan*, 107 Conn. 342, 349, 140 A. 745 (1928). "The relationship between contracting parties cannot amount to a joint venture

unless the parties so intend." *Electronic Associates, Inc.* v. *Automatic Equipment Development Corp.*, 185 Conn. 31, 35, 440 A.2d 249 (1981). Generally, joint ventures relate to a single transaction, whereas partnerships exist for a general business. 1 R. Rowley, Partnerships (2d Ed. 1960) § 6.1, p. 39; see *Roberts* v. *Weiner*, supra, 671 ("[w]e have pointed out that the distinction between a partnership and a joint adventure is often very slight, but that commonly the former is formed for carrying on a general business, while the latter is more often limited to a single transaction or course of transactions" [internal quotation marks omitted]); *Dolan* v. *Dolan*, supra, 349 ("[w]hile the distinction between a partnership and a joint adventure is often very slight, it is commonly considered that, as respects the character of the enterprise, a partnership is formed for the purpose of carrying on a general business of one sort or another, and a joint adventure is more commonly limited to a single transaction or course of transactions"). Partnerships, however, may also exist for the purpose of a single transaction. 1 R. Rowley, supra, § 6.5, p. 77.

We noted in *Lesser* v. *Smith*, supra, 115 Conn. 89, that "the relations and obligations of [a joint venture] in general are those which govern a partnership. This concept of a joint adventure as distinguished from a partnership, is of comparatively modern origin and is a creation of the American courts. At common law and still in England, such an enterprise is treated as an informal partnership." Similarly, in *Dolan* v. *Dolan*, supra, 107 Conn. 349, we stated that a joint venture "was what at common law was looked upon as a sort of informal partnership. It would probably still be so considered in the British Dominion, but in this country it is commonly defined as a joint enterprise or adventure." Although regarded as an informal partnership, joint ventures are generally governed by the same principles

that govern common-law partnerships. 1 R. Rowley, supra, § 6.1, p. 39; see *Travis* v. *St. John*, 176 Conn. 69, 73, 404 A.2d 885 (1978); see also *Roberts* v. *Weiner*, supra, 137 Conn. 670–71 (applying to joint venture partnership principle that death of one partner dissolves partnership); *Roberts* v. *Weiner*, supra, 672 (duty of survivor of joint venture or partnership to wind up its affairs); *Roberts* v. *Weiner*, supra, 673 (accounting between joint venturers governed by same principles as accounting between partners). As in a partnership, the members of a joint venture "undertake fiduciary duties to each other concerning matters within the scope of the joint venture." *Electronic Associates, Inc.* v. *Automatic Equipment Development Corp.*, supra, 185 Conn. 35; see also *Meinhard* v. *Salmon*, 249 N.Y. 458, 463–64, 164 N.E. 545 (1928) ("[j]oint adventurers, like co-partners, owe to one another, while the enterprise continues, the duty of the finest loyalty").

The plaintiff points out that a key distinction between a joint venture and a partnership is that, although mutual agency is required in order to have a partnership; *Travis* v. *St. John*, supra, 176 Conn. 72–73; it is not required for the existence of a joint venture. *Dolan* v. *Dolan*, supra, 107 Conn. 349 ("[t]here is not the relation of principal and agent in joint adventure which we find in a partnership"). This distinction, however, does not alter our conclusion. The fact that a joint venture may not share every particular legal or factual characteristic of a common-law partnership does not mean that their similarities are insufficient to treat them the same for purposes of determining who may be an employer under the act.

To further its purposes, "[the] language [of the act] is not that of restriction or limitation, but all-embracing. . . . [I]t applies to *all contracts* of employment, and this was intended to mean . . . by *whomsoever made*. . . . *Douthwright* v. *Champlin*, [91 Conn. 524, 527, 100

A. 97 (1917)]." (Emphasis in original; internal quotation marks omitted.) *Dowling* v. *Slotnik,* supra, 244 Conn. 805; see also *Perille* v. *Raybestos-Manhattan-Europe, Inc.,* 196 Conn. 529, 541, 494 A.2d 555 (1985); *Adzima* v. *UAC/Norden Division,* 177 Conn. 107, 117, 411 A.2d 924 (1979); *DeCarli* v. *Manchester Public Warehouse Co.,* 107 Conn. 359, 364, 140 A. 637 (1928). "[T]he act must be interpreted liberally to achieve its humanitarian purposes . . . [and] this court should not impose limitations on the benefits provided for a . . . worker that the statute itself does not clearly specify. . . . *Gil* v. *Courthouse One,* 239 Conn. 676, 682–83, 687 A.2d 146 (1997)." (Internal quotation marks omitted.) *Hanson* v. *Transportation General, Inc.,* 245 Conn. 613, 626, 716 A.2d 857 (1998) (*Berdon, J.,* dissenting). It is consistent with these general principles to treat joint ventures similarly to partnerships for purposes of determining those entities that may qualify as an employer under the act.

Finally, excluding joint ventures from the scope of the act's coverage, as a matter of law, would, under certain circumstances, impede the legislative policy the statute was designed to effectuate. "The purpose of the [workers'] compensation statute is to compensate the worker for injuries arising out of and in the course of employment, without regard to fault, by imposing a form of strict liability on the employer. *Panaro* v. *Electrolux Corp.,* [208 Conn. 589, 598–99, 545 A.2d 1086 (1988)]; *Jett* v. *Dunlap,* [179 Conn. 215, 217, 425 A.2d 1263 (1979)]. The [act] compromise[s] an employee's right to a common law tort action for work related injuries in return for relatively quick and certain compensation. *Panaro* v. *Electrolux Corp.,* supra, 599; see *Hunnihan* v. *Mattatuck Mfg. Co.,* 243 Conn. 438, 446, 705 A.2d 1012 (1997); *Dodd* v. *Middlesex Mutual Assurance Co.,* [supra, 242 Conn. 381]; *Mingachos* v. *CBS,*

*Inc.*, [supra, 196 Conn. 97].'' (Internal quotation marks omitted.) *Dowling* v. *Slotnik*, supra, 244 Conn. 799.

The following hypothetical situation illustrates how excluding joint ventures from the act's scope would impede its purpose: An art museum and a cultural center for the arts form a joint venture for the purpose of hosting special events, whereby the cultural center, which has considerable seating availability, provides the facilities for the events, and the art museum displays various pieces of art and provides commentary on them. The cultural center employs and pays the salary of a janitor, who cleans the center for these events. In fact, however, both the art museum and the cultural center, as joint venturers, exercise control over the manner in which the janitor's duties are to be carried out. During the course of cleaning the stage, the janitor is injured. He seeks to recover workers' compensation benefits from the art museum because the cultural center, which pays his salary, has no workers' compensation coverage. If joint ventures were excluded, as a matter of law, from the purview of the act, the janitor would be precluded from recovering workers' compensation benefits from the art museum, even though at the time of the accident he was acting in furtherance of the joint venture, and the art museum exercised control over his conduct. We fail to see how precluding recovery, as a matter of law, in such a circumstance would further the remedial purpose of the act.

B

The defendant next argues that the trial court improperly concluded that a profit motive is required in order for a joint venture to exist, thereby precluding the defendant, which is a nonprofit organization, from asserting that it was the plaintiff's employer by virtue of its joint venture with the hospital, which also is a nonprofit organization. The plaintiff maintains, however, that the

existence of a joint venture requires a profit motive and that, therefore, the relationship between the defendant and the hospital cannot constitute a joint venture because their affiliation lacks such a motive.[24] We agree with the defendant, and we conclude that although a profit motive is often recognized as one factor suggesting the existence of a joint venture, the absence of a profit motive is not fatal, as a matter of law, to the existence of a joint venture.

The legislature, in the context of statutes other than the act, has used the term "joint venture" to include nonprofit organizations. This treatment by the legislature supports our conclusion that nonprofit organizations are not precluded, as a matter of law, from forming joint ventures. See, e.g., General Statutes § 8-113a (n)[25] (" '[h]ousing partnership' means any partnership, limited partnership, *joint venture*, trust or association *consisting of* . . . a housing authority, *a nonprofit corporation or both*" [emphasis added]); General Statutes § 8-430 (27)[26] (" '[h]ousing partnership' means any

---

[24] The defendant acknowledges that its affiliation with the hospital was not for profit.

[25] General Statutes § 8-113a (n) provides: " 'Housing partnership' means any partnership, limited partnership, joint venture, trust or association consisting of (1) a housing authority, a nonprofit corporation or both and (2) (A) a business corporation incorporated pursuant to chapter 601 or any predecessor statutes thereto, having as one of its purposes the construction, rehabilitation, ownership or operation of housing, and having articles of incorporation approved by the commissioner in accordance with regulations adopted pursuant to section 8-79a or 8-84, (B) a for-profit partnership, limited partnership, joint venture, trust, limited liability company or association having as one of its purposes the construction, rehabilitation, ownership or operation of housing, and having basic documents of organization approved by the commissioner in accordance with regulations adopted pursuant to section 8-79a or 8-84 or (C) any combination of the entities included under subparagraphs (A) and (B) of this subdivision."

[26] General Statutes § 8-430 (27) provides: " 'Housing partnership' means any partnership, limited partnership, joint venture, trust or association consisting of (A) one or more nonprofit entities, and (B) (i) one or more business corporations incorporated pursuant to chapter 601 or any predecessor statutes thereto or authorized to do business pursuant to chapter 601 having as a purpose the construction, acquisition or related rehabilitation of

partnership, limited partnership, *joint venture*, trust or association consisting of . . . *one or more nonprofit entities*" [emphasis added]); and General Statutes § 10a-252 (4) (" '[j]oint venture' means a cooperative contractual arrangement between the corporation and one or more other parties including, but not limited to, hospitals, physicians, dentists, medical and dental clinics, health maintenance organizations, insurance companies, venture capital firms, banks and governmental agencies").

Furthermore, to allow the formation of a joint venture without a profit motive, and to include such a venture within the purview of the act, is consistent with the applicability of the act to other nonprofit employers. It is the majority rule, with which we agree, that workers' compensation acts generally apply to charitable and other nonprofit employers. 4 A. Larson & L. Larson, Workers' Compensation Law (1999) § 72.04 [2]. For example, in *Levecque* v. *Dupuis*, 119 Conn. 224, 229–30, 175 A. 782 (1934), this court, upon concluding that the plaintiff had sustained injuries while in the employ of the defendant church, applied the act to the church and required it to provide workers' compensation benefits to the plaintiff, despite the lack of a profit motive on the part of the church. It would be incongruous to conclude that a single nonprofit entity may be an employer under the act, but that a joint venture of two such entities may not be an employer under the act.

---

affordable or assisted housing, and having a certificate or articles of incorporation approved by the commissioner in accordance with regulations adopted pursuant to section 8-437, (ii) one or more for-profit partnerships, limited partnerships, joint ventures, sole proprietorships, trusts or associations having as a purpose the construction, acquisition or related rehabilitation of affordable or assisted housing, and having basic documents of organization approved by the commissioner in accordance with regulations adopted pursuant to section 8-437, or (iii) any combination of the entities specified in subparagraphs (i) and (ii) of this subdivision."

The plaintiff also argues that a joint venture that lacks a profit motive cannot be an employer under the act because a profit motive is required for a common-law partnership. We disagree. It is true that a profit motive is required for a common-law partnership.[27] See, e.g., E. Gilmore, Partnership (1911) p. 1 ("[p]artnership is a relation existing, by virtue of a contract, express or implied, between persons carrying on a business owned in common, with a view of profit to be shared by them"); F. Burdick, Partnership (3d Ed. 1917) p. 34 ("[w]e have seen that the earliest form of partnership recognized by English law . . . existed for the purpose of pecuniary gain"); 1 R. Rowley, supra, § 6.1, p. 39 ("[p]artnership is distinguished from certain other forms of voluntary relationships . . . because the latter are not carried on for profit").

That does not mean, however, that a joint venture between two nonprofit organizations—an association that, presumably, therefore, does not have a profit motive—is legally precluded from the definition of employer under the act. The remedial purposes of the act, and the incongruity of such a preclusion when a single nonprofit entity may be an employer, counsel

---

[27] The defendant argues to the contrary, relying on *Jenkins* v. *Reichert*, 125 Conn. 258, 5 A.2d 6 (1939), in which the defendants requested a jury instruction that, in order to find a partnership, the jury had to find "that all acts and things necessary to be done in connection with this work were done . . . with the expectation that both would profit from their joint enterprise . . . ." (Internal quotation marks omitted.) Id., 261. This court rejected that instruction, stating that "[*p*]*rofit-sharing* is not only not the sole but *not even an essential test of the existence of a partnership.*" (Emphasis added.) Id.; *Active Market, Inc.* v. *Leighton*, 124 Conn. 500, 504, 200 A. 822 (1938). There is an important distinction, however, between profit motive and profit sharing. Profit sharing is simply one type of evidence of an intention to form a partnership. See E. Gilmore, Partnership (1911) p. 19 ("The rule which made the sharing of profits a test of partnership rather than a test of intention to form a partnership was overthrown in England, and was never generally accepted in the United States. Partnership liability grows out of true partnership only. Sharing of profits is evidence merely of intention.").

strongly against such a conclusion. Although, in concluding that the language of the act is broad enough to include joint ventures we pointed to the similarities between partnerships and joint ventures, we do not suggest that only a joint venture that also would be considered a partnership under the act may be deemed an employer under § 31-275 (10).

C

Having concluded that a joint venture between two nonprofit organizations *may* be an employer under the act, we next consider the specific circumstances under which either one of the joint venturers will be deemed to be an employer for purposes of the act. "The entire statutory scheme of the [act] is directed toward those who are in the employer-employee relationship as those terms are defined in the act and discussed in our cases. That relationship is threshold to the rights and benefits under the act . . . . *Vanzant* v. *Hall*, 219 Conn. 674, 678, 594 A.2d 967 (1991); *Castro* v. *Viera*, [207 Conn. 420, 433, 541 A.2d 1216 (1988)]." *Dowling* v. *Slotnik*, supra, 244 Conn. 800–801. Just as a claimant may invoke the act's remedies only if the claimant satisfies the jurisdictional requirement of an employee as set forth in § 31-275 (9); *Dowling* v. *Slotnik*, supra, 800–801; *Kinney* v. *State*, 213 Conn. 54, 60, 566 A.2d 670 (1989); only those defendants who satisfy the requisite jurisdictional standard of an employer as set forth in § 31-275 (10) may successfully assert the exclusivity of the act as a bar to a common-law action by an alleged employee.

Whether a joint venturer is an employer under the act is therefore a question of the specific joint venturer's degree of control over the alleged employee. "The 'right to control' test determines the [relationship between a worker and a putative employer] by asking whether the putative employer has 'the right to control the means and methods' used by the worker in the performance

of his or her job. *Hunte* v. *Blumenthal*, 238 Conn. 146, 154, 680 A.2d 1231 (1996); *Silverberg* v. *Great Southwest Fire Ins. Co.*, 214 Conn. 632, 639, 573 A.2d 724 (1990); *Ross* v. *Post Publishing Co.*, [129 Conn. 564, 567, 29 A.2d 768 (1943)]." *Hanson* v. *Transportation General, Inc.*, supra, 245 Conn. 620. "The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent. . . . *Latimer* v. *Administrator*, [216 Conn. 237, 248, 579 A.2d 497 (1990)]; *Caraher* v. *Sears, Roebuck & Co.*, 124 Conn. 409, 413–14, 200 A. 324 (1938)." (Internal quotation marks omitted.) *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 697, 651 A.2d 1286 (1995).

Our conclusion is consistent with this court's decision and underlying rationale in *Coady* v. *Igo*, 91 Conn. 54, 98 A. 328 (1916). In *Coady*, the plaintiff widow of a plumber, who died while attempting to locate a gas leak in his employer's shop, sought recovery from her husband's employer under the act. Id., 54–55. She claimed that, although his plumbing business employed less than five employees, he still qualified as an employer under the act by virtue of his joint venture with a master carpenter and a master mason. These three master craftsmen had formed a joint venture for the purpose of purchasing land and building houses thereon. Id., 55.

The plaintiff argued that, because some carpenters, who were supplied by the master carpenter, were working on houses for the joint venture on the day of her husband's death, they should be counted toward the number of employees employed by her husband's employer. Id., 55–56. The court rejected this argument, finding that "these three men, each engaged in different, established business, associated themselves in an outside joint adventure. Each agreed to furnish at cost the

labor and materials which he was specially equipped to furnish, and each was to have the control of his own men. As between themselves each remained the sole employer of his own workmen, having the exclusive right of hiring, controlling and discharging them, and the exclusive responsibility for their wages. To that extent the partners expressly agreed not to confer mutual agency each upon the other." Id., 56. The court held that "the finding of facts as to the actual scope of [the coadventurer's] agency" controlled the workers' compensation claim. Id., 57. The court did not analyze the differences between a partnership and a joint venture and, in fact, used the terms interchangeably. Instead, the court concluded that it was a matter of *fact*, namely, the coadventurer's lack of control over the decedent, that precluded the application of the act to the specific joint venturer. Id.

D

With these legal conclusions in mind, we turn to the allegations in the defendant's special defense to determine whether it properly alleged facts sufficient to support its claim of immunity under the act. Mindful of the well settled principles concerning the construction of pleadings, we conclude that the allegations of the special defense, properly construed, would permit proof of facts sufficient to invoke immunity under the act.

In the stricken special defense, the defendant alleged that it and the hospital were involved in a joint venture, "in which they combined their respective property, money, efforts, skill and knowledge in the common purpose of operating the internal medicine residency program to educate and train participants such as the plaintiff." The defendant also alleged that this joint venture was one in which it and the hospital "each had a voice." It alleged that the plaintiff was injured while participating in the residency program, and that the

defendant's coadventurer, the hospital, had paid, and would continue to pay, workers' compensation benefits to the plaintiff. We conclude that under these allegations, the defendant could have proven that it had a sufficient right to control the plaintiff's conduct so as to satisfy the requirements of the act.

The plaintiff argues that the special defense must fail because direct employment is required in order to fall under the act's coverage, and that because the defendant was not her direct employer as conceded in the pleadings, it may not be deemed an employer for purposes of the act. We disagree. Reading the special defense broadly in the defendant's favor, as we must, we infer from the defendant's various uses of the term direct employment—for example, when it states that the plaintiff was a direct employee of the hospital—that it meant that the hospital, rather than the defendant, paid the plaintiff's salary. This allegation, however, is not inconsistent with proof that the defendant nonetheless had a sufficient degree of the right to control the plaintiff so as to satisfy the requirements of employment under the act. Whether an employer-employee relationship exists for purposes of the act is a question of the right to control, and not whether an employee is a direct employee of one or the other joint venturers.

Finally, the plaintiff argues that the special defense must fail because it alleges that the plaintiff's role in the joint venture was only as a student, and not as an employee. The specific language in the special defense states that "the common purpose [between the defendant and the hospital] of operating the internal medicine residency program [was] to educate and train participants such as the plaintiff." This language does not by itself preclude proof of an employer-employee relationship between the plaintiff and the defendant. Depending on the evidence adduced, a medical resident who is to

be educated and trained also may be an employee for purposes of the act.[28]

Although we conclude that the defendant has carried its burden of *pleading* that it is entitled to immunity under the act, on retrial the defendant will retain the burden of *proving* that it is so entitled. It remains the burden of the party asserting the exclusivity of the act to prove that a joint venture existed, that it exercised the requisite control over the injured party to satisfy the right to control test, and that the injured party was injured while acting in furtherance of the joint venture. We conclude only that the allegations of the defendant's special defense were legally sufficient and, therefore, that the trial court improperly struck the special defense.[29]

### III

### THE JURY INSTRUCTION

The defendant's final claim is that the trial court, *Pittman, J.*, improperly failed to instruct the jury that,

[28] Indeed, in the present case it is undisputed that the plaintiff, although a resident at the hospital, also was considered to be an employee of the hospital for purposes of the act.

[29] The defendant also contends that the trial court improperly held that, because it neither paid the plaintiff's salary nor secured workers' compensation coverage for her, it had not complied with § 31-284 (b), which requires employers to provide proof of financial ability to pay compensation benefits to injured employees, and permits plenary suits by employees against employers who do not comply with that requirement. Because the plaintiff expressly states that she does not rely on § 31-284 (b) in arguing that the defendant could not be deemed her employer, we only briefly consider the argument. We discern no purpose in precluding a joint venturer, who satisfies the right to control test as developed by our case law, from asserting the act's exclusivity as a bar in a situation where the injured employee has obtained workers' compensation benefits from the coadventurer. The defendant directs our attention to the following cases that stand for the same proposition: *Burke* v. *Charles B. Esher, Inc.*, 397 So. 2d 439 (Fla. App. 1981); *Haertel* v. *Sonshine Carpet Co.*, 104 Nev. 331, 333–34, 757 P.2d 364 (1988); *Lawler* v. *Dallas Statler-Hilton Joint Venture*, 793 S.W.2d 27, 29 (Tex. App. 1990); *Cook* v. *Peter Kiewit Sons Co.*, 15 Utah 2d 20, 23–24, 386 P.2d 616 (1963).

in order to find the defendant liable, it must base its findings on credible expert testimony.[30] We agree with the defendant's claim.

The defendant submitted a request to charge instructing the jury that, although it was not required to believe the expert testimony, it must base its conclusions regarding the standard of care issues on expert testimony, in order to find the defendant negligent.[31] Although the trial court gave the standard instruction that the jury did not have to accept the expert testimony, the court declined to give the defendant's proffered instruction, and instead, charged the jury as follows: "On the issue of any duty owed by the defendant to the plaintiff, you *may* consider the evidence of the medical experts on what standard of care was appropriate in 1988 in the circumstances in which the plaintiff and the defendant found themselves."[32] (Emphasis added.)

[30] Our conclusion in part II D of this opinion, namely, that the trial court improperly struck the defendant's special defense, requires a new trial. We consider this claim, however, because it is likely to arise on the remand. See *State* v. *Skipper*, 228 Conn. 610, 625, 637 A.2d 1101 (1994). Also, this procedural posture makes it unnecessary to consider the plaintiff's contention that any error in the instructions was harmless.

[31] The defendant's request to charge provided in relevant part: "You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves. . . . It is in no way binding upon you. . . . In order to recover on her claim against the [defendant], the plaintiff must prove by the preponderance of the evidence three elements: First, the plaintiff must establish by expert testimony the particular standard of care to which the defendant had a duty to conform. Second, the plaintiff must prove by expert testimony that the defendant failed to measure up to that applicable standard of care. Third, the plaintiff must prove by expert testimony that the defendant's deviation, or [departure] from the applicable standard of care, was the proximate cause of plaintiff's injuries."

[32] With regard to negligence, the trial court gave the following instruction: "The plaintiff has alleged that she has been injured by the defendant's negligence. Negligence involves the violation of a legal duty—negligence involves the violation of a legal duty which one owes to another to care for the safety of the other person or property. The principles of negligence law have been pronounced by courts in England and the United States of America for hundreds of years, so we often speak of these broad principles as common-law negligence and it can be stated as follows: When the activities

Upon the defendant's taking exception to the instruction given to the jury to the extent that the charge did not require expert testimony, the court responded: "I have suggested to the jury that expert testimony is relevant for them to consider with respect to the standard of care, but I have not restricted them to that, and I think that's all they'll need to do."[33]

Whether expert testimony was required to support the plaintiff's claim compels us to consider whether "the determination of the standard of care requires knowledge that is beyond the experience of [the] fact

of two persons or entities come together in such a way that unless proper care is used injury is likely to result, each must use reasonable care to avoid the injury.

"The plaintiff claims that the defendant was negligent in the way it acted here. Negligence is the doing of something that a reasonably prudent person would not do under the circumstances, or conversely, failing to do what a reasonably prudent person would do under the circumstances. It's the breach or violation of a legal duty owed by one to another, and such legal duty is the exercise of reasonable care. Reasonable care is defined as the care which an ordinarily prudent or careful person would use in view of the surrounding circumstances. You must determine the question by placing an ordinarily prudent person in the situation and ask yourselves what would such a person have done? Note that it is the care which such a person would have used under the surrounding circumstances, that is, in view of the facts known or the facts of which the defendant should have been aware at the time. You see, the standard of care required of an ordinarily prudent person under the circumstances never varies, but the degree or the amount of care may vary with those circumstances. For example, in circumstances that involve only a slight risk or danger, a slight amount of care might be sufficient to constitute reasonable care, while in circumstances of greater risk or greater danger an accordingly great amount of care would be required to constitute reasonable care.

"Since the intricacies of the operation of medical residency programs are normally outside the knowledge of most lay persons, each side has questioned witnesses who have an expertise in this area. On the issue of any duty owed by the defendant to the plaintiff, you may consider the evidence of the medical experts on what standard of care was appropriate in 1988 in the circumstances in which the plaintiff and the defendant found themselves."

[33] The plaintiff agreed at oral argument before this court that the trial court's instructions as given did not require the jury to rely on expert testimony in order to find the defendant liable.

finder . . . ." *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996); see *State* v. *McClary*, 207 Conn. 233, 245, 541 A.2d 96 (1988) (expert testimony required because nature and cause of victim's injuries "manifestly beyond the ken of the average trier of fact, be it judge or jury"); see also *Jaffe* v. *Dept. of Health*, 135 Conn. 339, 349, 64 A.2d 330 (1949); *Sickmund* v. *Connecticut Co.*, 122 Conn. 375, 379, 189 A. 876 (1937); *Slimak* v. *Foster*, 106 Conn. 366, 368, 138 A. 153 (1927); *Matyas* v. *Minck*, 37 Conn. App. 321, 326, 655 A.2d 1155 (1995).

"Generally, expert testimony is *admissible* if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Emphasis added; internal quotation marks omitted.) *State* v. *McClendon*, 248 Conn. 572, 586, 730 A.2d 1107 (1999). In some circumstances, however, expert testimony is not only admissible, it is required to support a claim. "Except in the unusual case where the want of care or skill is so gross that it presents an almost conclusive inference of want of care; *Puro* v. *Henry*, 188 Conn. 301, 305, 449 A.2d 176 (1982); the testimony of an expert witness is necessary to establish both the standard of proper professional skill or care on the part of a physician; *Shelnitz* v. *Greenberg*, 200 Conn. 58, 66, 509 A.2d 1023 (1986); and that the defendant failed to conform to that standard of care. *Mather* v. *Griffin Hospital*, 207 Conn. 125, 131, 540 A.2d 666 (1988); *Snyder* v. *Pantaleo*, [143 Conn. 290, 295, 122 A.2d 21 (1956)]. . . . *Campbell* v. *Palmer*, 20 Conn. App. 544, 548, 568 A.2d 1064 (1990)." (Internal quotation marks omitted.) *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 252, 654 A.2d 748 (1995).

On the basis of these well established principles, we conclude that expert testimony was required to support

the specifications of negligence submitted to the jury in the present case. The plaintiff's amended complaint alleged that the defendant: "a. failed to adequately and properly supervise and train the plaintiff; b. failed to adequately and properly teach, train and demonstrate to the plaintiff the proper performance of arterial line insertions; c. failed to adequately and properly instruct the plaintiff in techniques to avoid exposure to patient's blood during arterial line insertions; d. failed to correct the plaintiff's improper technique used in inserting arterial lines; e. failed to adequately and properly instruct the plaintiff in techniques to avoid needle punctures with contaminated blood during arterial line insertions; f. ordered the plaintiff to insert an arterial line in an AIDS patient without adequate training; g. ordered the plaintiff to insert an arterial line in an AIDS patient without supervision; h. failed to assess the plaintiff's ability to insert an arterial line prior to ordering the plaintiff to perform said procedure; i. knew or should have known that the plaintiff was not competent to perform the insertion of an arterial line but ordered the plaintiff to perform said procedure on an AIDS patient; j. failed to adequately train the plaintiff regarding safety procedures to be employed when inserting arterial lines; k. failed to instruct residents such as the plaintiff to decline to undertake procedures where competence was lacking; l. failed to train more senior residents in the proper instruction of residents under their supervision; m. knew or should have known that the plaintiff was likely to be exposed to HIV infection by the improper insertion of arterial lines without proper training but failed to warn the plaintiff of the risk of such exposure; n. coerced or otherwise pressured the plaintiff to undertake the performance of procedures regardless of competence; o. failed to provide a safe work environment; p. failed to provide graded responsibility to residents in the program, such as the plaintiff, in

accordance with their current competence; [and] q. failed to consider the welfare of the residents, such as the plaintiff, in assigning them to high risk patients without adequate training."

Simply put, these allegations required the jury to answer questions that may not be appropriately answered by laypersons. They require specialized knowledge and expertise regarding the standard of care that applied to residency training programs in 1988, and whether the alleged failures of the defendant constituted a breach of that standard. Defining that standard of care and determining whether the alleged conduct constituted a breach of that standard are simply not matters of common sense or within the experience of laypersons. See *Santopietro* v. *New Haven,* supra, 239 Conn. 226–29 (requiring expert testimony in order to establish standard of care applicable to umpires and that alleged conduct constituted breach of that standard). Thus, the jury should have been restricted to credible expert testimony in resolving the issues of the applicable standard of care and whether that standard had been breached by the defendant.

Moreover, the fact that we concluded in part I A of this opinion, that the plaintiff's claim sounded in negligence, rather than educational malpractice, does not automatically mean that the jury may be left to its own devices in evaluating the reasonableness of the defendant's conduct. The question is not the label placed on the claim. The question is whether the allegations presented to the jury, irrespective of that label, are within a juror's common sense or experience.

By using the word may—a term of permissive language—in its instruction to the jury that "you may consider the evidence of the medical experts on what standard of care was appropriate," the trial court vested the jury with discretion to base its conclusion as to the

standard of care on something other than the evidence of the medical experts. By not requiring the jury to rely on credible expert testimony in deciding the standard of care issues, the court improperly permitted a verdict in favor of the plaintiff even if the jury had found that the plaintiff's experts were not credible.

Our conclusion does not mean, of course, that the jury was required to believe the expert testimony. See, e.g., *Mather* v. *Griffin Hospital*, supra, 207 Conn. 145 ("[t]he jury is under no obligation to credit the evidence proffered by any witnesses, including experts . . . even if that evidence is uncontroverted" [citations omitted]); *Bieluch* v. *Bieluch*, 199 Conn. 550, 555, 509 A.2d 8 (1986) ("[t]he trial court is not bound by the uncontradicted testimony of any witness"); see also C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988 & Sup. 2000) § 3.1. It means only that the jury could not appropriately make factual findings on the allegations regarding the standard of care, based on something other than the evidence of the medical education experts. Stated another way, if, with respect to any specification of negligence, the jury did not believe the relevant expert testimony, it would have to find for the defendant on that specification, because the plaintiff would not have met her burden of proof.[34]

The plaintiff contends that expert testimony was not required as a foundation for a finding of liability "in this case because the standard of care issues either were undisputed or were matters of common sense, or both." According to the plaintiff, because all of the witnesses agreed that she should have removed the needle from the immediate area after withdrawing it from the catheter, "the only question was whether the

[34] Similarly, the trial court should not submit to the jury any such specification that is not supported by expert testimony. See *State* v. *Adams*, 225 Conn. 270, 283, 623 A.2d 42 (1993); *Mack* v. *Perzanowski*, 172 Conn. 310, 313, 374 A.2d 236 (1977).

plaintiff knew it and, if not, why not." Resolving such a question, the plaintiff maintains, does not require expert testimony.

We disagree with the theory advanced by the plaintiff on this issue. The factual assertions that the plaintiff makes cannot convert a legally flawed jury instruction into a proper one. Such factual claims are appropriate in determining whether such a flawed instruction constitutes harmless error. As stated previously, however; see footnote 30 of this opinion; we need not reach the question of any alleged harm that resulted from the improper instructions. We therefore decline to address the plaintiff's factual claim that the standard of care issues were undisputed.

The judgment is reversed and the case is remanded for a new trial.

In this opinion PALMER, CALLAHAN, HENNESSY and LEUBA, Js., concurred.

SULLIVAN, J., with whom VERTEFEUILLE, J., joins, concurring in part and dissenting in part. I concur with part I of the majority opinion and dissent from parts II and III of that opinion.

I

The majority concludes that the trial court improperly struck the defendant's special defense asserting immunity from suit under the exclusivity provision of General Statutes § 31-284 (a)[1] of the Workers' Compensation Act (act). I respectfully disagree.

The defendant asserted the following special defense: "[The] [p]laintiff was injured on August 18, 1988, while

---

[1] Although General Statutes § 31-284a has been amended numerous times since the plaintiff's date of injury in 1988, those amendments are not relevant to this appeal. For convenience, references to § 31-284a throughout this opinion are to the current revision.

[she][2] was participating in a residency program in internal medicine. Although [the] plaintiff's complaint alleges . . . that Yale University [the defendant] was operating this program, the program was in fact operated by [the] plaintiff's direct employer, Yale-New Haven Hospital [hospital], and by [the defendant. The] [p]laintiff's injury occurred in the course of [her] work in that residency program and at the same time arose out of and within the scope of [her] direct employment by [the] [h]ospital. [The] [h]ospital has paid, and will continue to pay, workers' compensation benefits to [the] plaintiff and, therefore, it enjoys immunity from suit by reason of . . . § 31-284 (a) of the . . . [a]ct, which provides that all rights and claims between employer and employees are abolished other than the rights and claims given by the . . . [a]ct. Although [the] plaintiff was not a direct employee of [the defendant], [her] claims against [the defendant] in this action are likewise barred by . . . § 31-284 (a) because at the time of [her] injury the residency program in internal medicine was, and had been for many years, a joint adventure, venture, enterprise or undertaking between [the] [h]ospital and [the defendant] in which they each had a voice and in which they combined their respective property, money, efforts, skill and knowledge in the common purpose of operating the internal medicine residency program to educate and train participants such as the plaintiff."

The plaintiff moved to strike the defendant's special defense on the ground that "it [was] insufficient as a matter of law because: [(1) the] [p]laintiff's claims against [the defendant] are not barred by reason of the exclusivity provision of . . . § 31-284 (a); [(2) the defendant] is not an 'employer' as that term has been

---

[2] The pleadings originally used masculine pronouns to refer to the plaintiff.

defined by . . . General Statutes § 31-275 (10);[3] [(3) the defendant] is not a joint venturer; [and (4) the plaintiff] was not employed within the scope of the operation of the residency program."

The trial court noted that "[t]he [defendant] has acknowledged that it was not [the plaintiff's] direct employer but claims that it is entitled to the same immunity by virtue of its having engaged in a joint venture, enterprise or undertaking with the [h]ospital . . . ." The trial court then found that, as a matter of law, joint ventures are not included within the definition of "employer" under the act; see General Statutes § 31-275 (10); and that, in any case, not-for-profit entities cannot form a joint venture. The trial court observed that "[t]he [defendant] seeks the immunity offered by the workers' compensation statutes without having undertaken any of the obligations that would entitle it to such immunity. It has alleged in its . . . [s]pecial [d]efense that the scope, or common purpose, of the operation of the residency program was to educate and train students participating in the program. [The plaintiff's] only participation in the residency program at the time of [her] injury was as a student. [She] was not, therefore, involved in the operation of the program to educate and train. [The plaintiff] was the object of the program, not its operator, and the [the defendant] was [her] teacher, not [her] employer. [The plaintiff's] only employment was by the [h]ospital for the purpose of treating its patients. [Her] injury did not occur while

---

[3] General Statutes § 31-275 (10) provides in relevant part: " 'Employer' means any person, corporation, limited liability company, firm, partnership, voluntary association, joint stock association, the state and any public corporation within the state using the services of one or more employees for pay, or the legal representative of such employer . . . ."

Although § 31-275 (10) has been amended since the plaintiff's date of injury in 1988, those amendments are not relevant to this appeal. For convenience, references to § 31-275 (10) throughout this opinion are to the current revision.

performing the business of the affiliation between the [defendant] and the [h]ospital, and, the [defendant] is therefore not entitled to immunity from suit under . . . § 31-284."

"A motion to strike challenges the legal sufficiency of a pleading. . . . [I]t admits all facts well pleaded; it does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings." (Citations omitted.) *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108, 491 A.2d 368 (1985). A motion to strike "is to be tested by the allegations of the pleading [that is the subject of the motion to strike], which cannot be enlarged by the assumption of any fact not therein alleged. *Blanchard* v. *Nichols*, 135 Conn. 391, 392, 64 A.2d 878 [1949]; *Santoro* v. *Kleinberger*, 115 Conn. 631, 633, 163 A. 107 [1932]. *Wexler Construction Co.* v. *Housing Authority*, 144 Conn. 187, 194, 128 A.2d 540 (1956)." (Internal quotation marks omitted.) *Alarm Applications Co.* v. *Simsbury Volunteer Fire Co.*, 179 Conn. 541, 549–50, 427 A.2d 822 (1980).

I recognize that the "modern trend . . . is to construe pleadings broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 83, 700 A.2d 655 (1997). Even under this relatively generous standard, however, I would affirm the trial court's granting of the motion to strike. The defendant alleged in its special defense that the plaintiff's injury "arose out of and within the scope of [her] direct employment by [the] [h]ospital." It further alleged that the "plaintiff was not a direct employee of [the defendant] . . . ." I would affirm the trial court's granting of the motion to strike because, not only did the defendant fail to allege that it was the plaintiff's employer, but it specifically alleged that it was *not* the plaintiff's "direct employer," a term not used in the act. Section

§ 31-284 (a)[4] provides immunity only to employers. The allegation that the defendant was engaged in a joint venture with the plaintiff's employer is not, by itself, sufficient to confer employer status on the defendant. Neither is the defendant's allegation that the plaintiff's injury occurred during the course of her "work" in the residency program, which was operated, in part, by the defendant, sufficient for such a purpose. The special defense contains no allegation that the defendant had the "right to control" the plaintiff, which the majority recognizes as the test for an employer-employee relationship.[5] Thus, the defendant did not allege any of the elements required to claim immunity under the act. Furthermore, the necessary elements of the immunity defense are not *necessarily implied* by any of the allegations in the defendant's special defense. See *Clohessy* v. *Bachelor*, 237 Conn. 31, 33 n.4, 675 A.2d 852 (1996) ("[w]hat is necessarily implied [in an allegation] need not be expressly alleged"). Therefore, the defendant's special defense is legally insufficient and it was properly struck by the trial court.[6]

I am also not persuaded by the defendant's arguments at trial and during oral argument that its special defense contains a pleading in the alternative, and that the defendant's allegation that it was not the plaintiff's direct employer, therefore, should not be construed as an admission. The defendant claimed that its alternative

[4] General Statutes § 31-284 (a) provides in relevant part: "An employer who complies with the requirements of subsection (b) of this section shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained . . . ."

[5] As I indicate later in this dissenting opinion, I believe that this court should reexamine its use of the "right to control" test as the determinative test for employee-employer relationships in the context of workers' compensation claims involving issues of joint employment.

[6] The majority analyzes the special defense as if it alleged that the plaintiff was employed by the alleged joint venture. I do not read the special defense as containing such an allegation.

pleadings were: (1) that neither the plaintiff nor Alison Heald, a third year resident who had supervised the plaintiff, was an employee or an agent of the defendant; or (2) if Heald were found to be the defendant's agent, then the plaintiff must be the defendant's employee for the purposes of the act.

I am not persuaded by this argument because nothing about the defendant's special defense suggests that it is a pleading in the alternative. Furthermore, pleadings in the alternative must be "based on genuine doubt . . . ." (Internal quotation marks omitted.) *DeJesus* v. *Craftsman Machinery Co.*, 16 Conn. App. 558, 567, 548 A.2d 736 (1988). "The pleader states the facts in the alternative because he [or she] is uncertain as to the true facts." (Internal quotation marks omitted.) Id., 567–68. Only "[a]lternative fact[ual] allegations made in good faith and based on genuine doubt are not admissions against interest so as to be admissible in evidence against the pleader." (Internal quotation marks omitted.) Id., 567. Nowhere in its pleadings did the defendant indicate that it did not know whether the plaintiff was its employee.

Furthermore, at trial, Edwin C. Cadman, senior vice president of medical affairs for the hospital, professor of medicine at Yale University School of Medicine, chairman of the school's department of medicine and the person ultimately responsible for administration of the residency program when the plaintiff was accepted into it, specifically testified in response to questioning by the defendant that the plaintiff was not an employee of the defendant doing business as Yale University School of Medicine.[7] Finally, the defendant argued dur-

---

[7] The transcript reads in relevant part:

"[Defendant's Counsel]: By whom was [the plaintiff] employed when she began her residency program?

"[Cadman]: Yale-New Haven Hospital.

"Q. Let me show you defendant's exhibit 2, which has now been admitted as a full exhibit, and ask you whether you recognize that as [the plaintiff's] employment agreement with Yale-New Haven Hospital.

ing closing arguments that the plaintiff "was an employee of [the] [h]ospital, not an employee of [the defendant]. And there is no dispute about that." Yet the defendant argues that a new trial is required so that it can attempt to prove that the plaintiff was its employee. I cannot agree.

Moreover, I am not persuaded by the defendant's argument that it is somehow unfair to deprive the defendant of the immunity defense on the ground that the defendant had not alleged facts implying that it was the plaintiff's employer while simultaneously allowing the plaintiff to prove an agency relationship between Heald and the defendant for purposes of establishing vicarious liability. I recognize that, in Connecticut, the "right to control" test historically has determined the relationship between a worker and a putative employer. I believe, however, that this court should recognize that, while it is necessary to find a "right to control" in order to establish an employer-employee relationship, such a finding should not always be sufficient to establish such a relationship in the context of workers' compensation claims involving issues of joint employment.

In *Hanson* v. *Transportation General, Inc.*, 245 Conn. 613, 716 A.2d 857 (1998), on which the majority relies to support its conclusion that employer status for purposes of workers' compensation claims is a question of the right to control, this court recognized that

"A. Yes, it is.

"Q. Thank you. And was [the plaintiff], to your knowledge, an employee of Yale University or Yale Medical School?

"A. No, she was not.

"Q. And it was Yale-New Haven Hospital and not Yale University or Yale Medical School who paid the salary and the fringe benefits referred to here?

"A. Yes.

"Q. And is it true . . . that all of the participants in the residency program, the residents, first year, second year, third year, are employed by Yale-New Haven Hospital and not Yale Medical School?

"A. Correct."

"the right to control test, in its present form, was embedded into the act by early cases relying on similar rules in [vicarious liability] cases." Id., 617 n.5. Larsons' treatise, however, indicates that the concept of employee, for purposes of workers' compensation law, may be narrower than the common-law concept of servant, which turns on the right to control. 3 A. Larson & L. Larson, Workers' Compensation Law (1999) p. 64-1. The treatise states that "[t]he end product of a vicarious liability case [in which a master-servant relationship must be established] is not an adjustment of rights between employer and employee on the strength of their mutual arrangement, but a unilateral liability of the master to a stranger. The sole concern of the vicarious liability rule, then, is with the master: Did he or she accept and control the service that led to the stranger's injury? . . .

"Compensation law, however, is a mutual arrangement between the employer and employee under which both give up and gain certain things. Since the rights to be adjusted are reciprocal rights between employer and employee, it is not only logical but mandatory to resort to the agreement between them to discover their relationship. To thrust upon a worker an employee status to which he or she has never consented would not ordinarily harm him or her in a vicarious liability suit by a stranger against his employer, but it might well deprive him or her of valuable rights under the compensation act, notably the right to sue his or her own employer for common-law damages." 3 id., § 64.01, pp. 64-2 through 64-3.[8] Therefore, I do not believe that a

---

[8] This portion of Larsons' treatise was relied on by the Supreme Court of Alabama in *Ex parte Stewart*, 518 So. 2d 118 (Ala. 1987). In that case, the petitioner, a resident manager of an apartment complex brought a workers' compensation claim against the rental and management agent for injuries incurred during a fire. Id., 119. The trial court ruled that, because the owners of the apartment complex had retained a right of control over the petitioner's work, she was an employee of the owners, not of the rental and management agent. See generally *Stewart* v. *Carter Realty Co.*, 518 So. 2d 117 (Ala. Civ. App. 1986). The Alabama Supreme Court concluded that "[a] finding of

determination that there was a master-servant relation-ship between the defendant and Heald, based on the defendant's "right to control," necessarily, or even pre-sumptively, should be conclusive as to whether Heald was the defendant's employee. Much less should such a determination be conclusive as to whether the plaintiff was the defendant's employee.

## II

The majority has concluded that the plaintiff's claim is not an educational malpractice claim. The majority, instead, has concluded, and I agree, that this claim is a simple tort claim governed by *Kirchner* v. *Yale University*, 150 Conn. 623, 192 A.2d 641 (1963). I also agree with the majority that the fact that this is a simple negligence claim does not necessarily mean that the plaintiff is not required to present expert testimony. For the reasons that follow, however, I do not agree with the majority that the trial court's instruction to the jury that it may, rather than must only, consider expert testimony was harmful error.

It is well established that, if "the determination of the standard of care requires knowledge that is beyond

control in one putative employer does not absolve the other putative employer of compensation liability, where there is evidence of joint or concurrent control." *Ex parte Stewart*, supra, 121. The Alabama Supreme Court also concluded, however, that "the finder of fact should concentrate, not solely on control, but also on additional indicia of the employment relationship in determining an employee's status.

* * *

"In spite of the appearance of some possible 'control' in the owners, if no contractual relationship existed between the owners and [the petitioner], then [she] was not their employee . . . ." (Citations omitted.) Id. I find this approach, which focuses on the contractual intentions of the parties, to be more reasonable than the strict "right to control" test employed by this court. Following the approach taken by the Alabama Supreme Court in *Stewart* in this case, Cadman's testimony at trial that the plaintiff's employ-ment agreement was exclusively with the hospital; see footnote 7 of this dissenting opinion; would strongly suggest that the plaintiff was not the defendant's employee.

the experience of an ordinary fact finder, expert testimony will be required." *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996). In *Kirchner*, because the proper method of operating a jointer, a device used to plane wood; *Kirchner* v. *Yale University*, supra, 150 Conn. 625; was not within the knowledge or experience of the ordinary fact finder, the plaintiff presented expert testimony "that a push block rather than a push stick was the proper and reasonably safe device to use in operating the jointer." Id., 627. The plaintiff then presented factual testimony that "the plaintiff did not see, nor know of, a push block or any device other than the push stick . . . that no push block was made available for use by the plaintiff, and that there were no regulations, warnings, or instructions posted in the shop, or otherwise communicated to the plaintiff, regarding the safe and proper operation of the jointer or the dangers incident to the use of a push stick in its operation." Id. Thus, the plaintiff in *Kirchner* presented expert testimony on the method of operating a jointer, which required special knowledge, and factual testimony on whether the plaintiff was properly instructed in that method or warned of the dangers of operating the machine in any other method, which was within the knowledge of laypersons. Id. This court concluded that, on the evidence presented, "a jury could well have concluded that in the exercise of reasonable care the defendants should have anticipated that unless they made a push block available and gave some warning or instruction to the plaintiff that he should use a push block rather than a push stick in the operation of the jointer, harm of the general nature of that which actually occurred was likely to result, and that the defendants' failure in each respect constituted negligence . . . ." Id., 627–28.

In this case, following the *Kirchner* paradigm, the issue of whether the defendant breached the standard

of care can be divided into the following subissues: (1) what was the proper method for performing an arterial line insertion; and (2) did the defendant properly instruct the plaintiff in that method?

Determination of the first subissue clearly requires the fact finder to have specialized knowledge, and the plaintiff, therefore, is required to present expert testimony on that subissue. With the exception of Heald, whose deposition testimony was admitted at trial, all of the experts who testified at trial agreed that the proper method for arterial line insertion requires removal of the needle from the operative field immediately upon withdrawing it from the catheter.[9] Heald

[a] E. Clinton Lawrence, a physician who testified on behalf of the plaintiff as an expert in arterial line insertion techniques, testified that it is inherently dangerous to keep the needle in the operative field after withdrawing it from the catheter, and that that is not an acceptable method. On cross-examination, counsel for the defendant asked Lawrence: "And would you agree . . . that it is a basic principle that applies in every one of the literally hundreds of procedures in which health care professionals use needles, it's a basic principle that when you finish using the needle in the procedure you get rid of it?" Lawrence replied: "That is a basic principle, yes."

Louise Lucianin Fisher, a physician and the director of the internal medicine residency program at the hospital, testified that residents were given training in "universal precautions," which was designed to educate residents about protecting against exposure to blood-borne pathogens. Fisher testified that, pursuant to these universal precautions, it is improper to keep the needle in the operative field in order to reinsert the needle into the catheter. Fisher clarified her testimony on cross-examination, stating that universal precautions require needles to be taken out of the operative field as soon as they are no longer needed. Fisher further testified that, if a person believed that reinsertion of the stylet into the catheter after withdrawal was proper, then the needle would still be needed, and failing to take it out of the operative field would not violate universal precautions.

Mary M. Cooke, a physician who testified on behalf of the plaintiff as an expert in the training of medical residents, testified that the needle should be taken out of the operative field after withdrawing it from the catheter, as there is no use for it after that point. Cooke testified that the needle should never be reinserted because of the danger of cutting the catheter with the tip of the needle. Cooke further testified that the procedure is "very difficult," and that a new intern would not be expected to be competent at performing the procedure, even if the intern had extensive experience with other medical procedures involving the use of needles. Cooke further testi-

testified at her deposition that she found the method the plaintiff used in reenacting the injury, during which she kept the needle in her left hand after withdrawing it from the catheter, to be acceptable. The defendant, however, did not adopt the position taken by Heald. Rather, during its closing arguments to the jury, the defendant argued that the plaintiff "did this procedure perfectly from beginning to end, except for one thing: she violated the most basic principle—when you take the needle out and you are through with that needle in the procedure, get rid of it. She didn't do that. And that's why she stuck herself. And both [doctors Mary M.] Cooke and . . . [E. Clinton] Lawrence acknowledged that the reason she stuck herself was because she violated this basic principle: that she did not remove the needle from the field as soon as she was through using it."

Thus, there clearly was no dispute between the parties as to the first subissue concerning the standard of care. Both parties adopted the expert testimony that the method of arterial line insertion that the plaintiff used was improper and that the proper method required removal of the needle from the operative field as soon as it was no longer needed. Therefore, even though I

fied that Heald "was clearly not teaching [the procedure] properly."

The plaintiff testified that, when Heald demonstrated the procedure to her, Heald continued to hold the needle in her right hand after withdrawing it from the catheter. The plaintiff also testified that, when she performed the procedure under Heald's supervision, she reinserted the needle into the catheter after withdrawing it in an attempt to insert the catheter into the artery, and that Heald did not correct her method. The plaintiff testified further that, when she performed the procedure on another patient under Heald's supervision, she continued to hold the needle in her hand so that she could use it to reposition the catheter if required, and that Heald did not correct her. Finally, the plaintiff testified that, when she performed the procedure on the patient infected with the human immunodeficiency virus, she kept the needle in her left hand after withdrawing it from the catheter, and that she pricked her right thumb while trying to use her thumb to stem the flow of blood from the catheter.

would find that the jury charge[10] in this case was improper as to the first subissue because it implied a right of the jury to consult its own judgment and common sense rather than expert opinion, the impropriety was harmless. To conclude otherwise, this court must assume that the jury rejected the undisputed expert testimony that the technique the plaintiff used in inserting the arterial line was improper, and that the jury then came to the same conclusion relying only on its own common sense and experience. I decline to make that assumption.

With regard to the second subissue, namely, whether the defendant properly instructed the plaintiff in the proper method of performing an arterial line insertion so as to avoid injury, I would conclude that no specialized knowledge is required to find a breach of this duty.

"While the standard of care, skill and diligence is a matter of expert opinion and knowledge, the determination of the facts concerning the conduct under consideration is always for the jury." *Snyder* v. *Pantaleo*, 143 Conn. 290, 295, 122 A.2d 21 (1956). A plaintiff's expert witnesses need not specifically express an opinion that the defendant breached the standard of care in order for a plaintiff to prevail. See *Santopietro* v. *New Haven*, supra, 239 Conn. 229. Rather, the plaintiff need only produce "sufficient expert testimony to permit the jury reasonably to infer, on the basis of its findings of fact, that the defendant breached the standard of care." Id., 229–30. Breach of the standard of care may be proved "through the testimony of the defendant." Id., 229.

---

[10] The trial court instructed the jury as follows: "Since the intricacies of the operation of medical residency programs are normally outside the knowledge of most laypersons, each side has questioned witnesses who have an expertise in this area. On the issue of any duty owed by the defendant to the plaintiff, you may consider the evidence of the medical experts on what standard of care was appropriate in 1988 in the circumstances in which the plaintiff and the defendant found themselves."

In this case, both the plaintiff and the defendant agreed with the expert testimony that the proper method of performing an arterial line insertion required removal of the needle from the operative field immediately upon withdrawing it from the catheter. The plaintiff also presented factual testimony that the defendant never specifically had instructed her on how to control the flow of blood from the artery after insertion of the catheter. She presented factual testimony that, while performing the procedure under Heald's supervision, she kept the needle in her hand after withdrawing it from the catheter under the mistaken assumption that she could reinsert the needle. Furthermore, on one occasion, the plaintiff actually reinserted it. There was no testimony that Heald ever had instructed the plaintiff that her technique was improper or specifically had told her to remove the needle from the operative field immediately upon withdrawing it from the catheter. Rather, the plaintiff testified that Heald said nothing to her after observing her improper technique. In addition, Heald testified that she believed that the technique the plaintiff used during the procedure when she was injured was acceptable, and that it was acceptable to reinsert the needle into the catheter. The defendant did not dispute the factual testimony presented by the plaintiff, but argued, instead, that the plaintiff, by virtue of her prior medical school training, should have known, without further instruction, the "basic principle" that all needles should be removed from the operative field immediately after use, and that her injury, therefore, was a result of her own negligence.

In my opinion, based on this evidence, "an ordinary fact finder"; *Santopietro* v. *New Haven*, supra, 239 Conn. 226; could reasonably infer; see id., 229; based on its own judgment and experience, that the defendant had breached the standard of care by failing to instruct and warn the plaintiff in the conduct of this dangerous

procedure. See *Kirchner* v. *Yale University*, supra, 150 Conn. 627 (university has duty to exercise reasonable care "to instruct and warn students in the safe and proper operation of the machines provided for their use"). In *Kirchner*, the plaintiff presented no expert testimony that the *method of instruction* the defendants used was improper, but, rather, presented factual testimony that there had been no instruction in the proper technique. See id., 627–28. The court found that, based on this evidence, a jury reasonably could have concluded that the defendants had breached their duty. Id., 627.

Similarly, in this case, I do not believe that the plaintiff was required to present an expert opinion that the defendant's methods of instruction were improper. Rather, I would conclude that the factual testimony that the plaintiff presented, including Heald's deposition testimony that she found the plaintiff's technique to be acceptable and the plaintiff's uncontradicted testimony that she had received no instruction that her technique was improper, together with the expert testimony that the plaintiff's technique was improper and that first year residents must be specifically instructed to remove the needle from the operative field while performing an arterial line insertion,[11] was sufficient for the jury reasonably to infer that there had been no instruction in the proper technique for arterial line insertions, that the standard of care, therefore, had been breached, and that the defendant "should have anticipated . . . harm of the general nature of that which actually occurred was likely to result . . . ." Id., 627–28; see also *Santopietro* v. *New Haven*, supra, 239 Conn. 229–30 (plaintiff need only produce "sufficient expert testimony to permit the jury reasonably to infer, on the basis of its

---

[11] Lawrence, a physician and an expert in arterial line insertion, testified that first year residents must be specifically instructed to remove the needle from the operative field.

findings of fact, that [the defendant] breached the standard of care"). Therefore, I disagree with the holding of the majority that the trial court's jury instruction that the jury *may* consider expert testimony on whether the standard of care had been breached was improper as to the second subissue.

Furthermore, even if the jury were required to consider only expert testimony on the issue of whether the defendant had breached the standard of care, the plaintiff presented ample, undisputed expert testimony to support the jury's verdict on that issue. Lawrence, a physician and an expert in arterial line insertion, testified that the technique the plaintiff had used under Heald's supervision was not acceptable. He testified that it would be a breach of the standard of care to instruct a first year resident to hold the needle "outside and in close proximity to the catheter," and that a first year resident must be specifically trained to remove the needle from the operative field. Lawrence also testified that it would be a breach of the standard of care to order a first year resident to insert an arterial line without supervision when he or she has performed only one prior successful arterial line insertion.

Louise Lucianin Fisher, a physician and the director of the hospital's internal medicine residency program, testified that the technique that the plaintiff used under Heald's supervision, and without correction by Heald, was not acceptable and should not have been used at the hospital in 1988. She also testified that, if a person believed that reinsertion of the needle into the catheter was acceptable, then it would not be a violation of universal precautions; see footnote 9 of this dissenting opinion; for that person to keep the needle in the operative field after withdrawing it from the catheter, because there would be a further use for it.

Cooke, a physician and an expert in the training of medical residents, testified that for Heald to have

observed the plaintiff while the plaintiff kept the needle in the field and then reinserted it into the catheter, and then to have failed to correct that technique, was "completely inadequate supervision . . . ."

Again, I find it implausible that the jury rejected all of this testimony that the defendant had failed to instruct the plaintiff in the proper technique for arterial line insertions, and then came to the same conclusion based on only its own judgment and experience. Therefore, even if the charge were improper, which I do not believe, it was harmless.

The majority holds that there was no expert testimony to support many of the allegations in the plaintiff's complaint. I do not agree.

The general theory under which the plaintiff proceeded in this case was that the defendant failed to train, supervise and evaluate the plaintiff properly and adequately, which resulted in her serious injury. This is the same general theory that this court recognized in *Kirchner* v. *Yale University*, supra, 150 Conn. 623. I would find that each of the specific factual allegations in the plaintiff's complaint is colorable under the theory of recovery recognized by this court in *Kirchner*. I recognize that some of the plaintiff's allegations are somewhat vague. For instance, the plaintiff alleged that the defendant "failed to provide a safe work environment . . . ." Based on the evidence presented, however, a reasonable jury could have found that the plaintiff failed to provide a safe work environment by failing to instruct the plaintiff in a proper and safe technique for performing arterial line insertions. In my opinion, there was sufficient evidence of each of the factual allegations in the plaintiff's complaint for the jury to have found that the defendant had breached the standard of care.

Accordingly, I concur in part and dissent in part.